Kevin HOWLETT et al.,
Plaintiffs-Appellants,

v.

The SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, MONTANA et al., Defendants-Appellees.

No. 75–1478.

United States Court of Appeals,
Ninth Circuit.

Jan. 22, 1976.

Paul B. Smith, of Kimble & Smith, Missoula, Mont., for plaintiffs-appellants.

Victor F. Valgenti, Missoula, Mont., Richard A. Baenen, of Wilkinson, Cragun & Barker, Washington, D. C., for defendants-appellees.

## OPINION

Before BARNES, SNEED and KENNEDY, Circuit Judges.

BARNES, Senior Circuit Judge:

This appeal involves two plaintiffs, Kevin Howlett and Bernard Clairmont, members of the Salish and Kootenai Tribes of the Flathead Reservation, Montana [herein Tribes] who contend that the refusal of the Tribes to declare them eligible candidates for tribal council membership deprived them of their right to travel and their right to run for office in violation of Section 1302(8) of the Indian Civil Rights Act (25 U.S.C. § 1302(8) (1968)). Plaintiffs' ineligibility was based upon their failure to satisfy the residency requirements for candidates seeking office under the Tribes' Constitution. Howlett and Clairmont ask this Court to grant them the following relief: (1) that the tribal election held December 15, 1973, for council membership be declared invalid, (2) that the Court order and direct the Tribal Council to conduct a special election according to guidelines established by the Court permitting plaintiffs to be candidates in that election, (3) that the Court declare invalid as violative of the Constitutional rights of Indians Article III, Sections 6 and 7 of the Constitution of the Confederated Salish and Kootenai Tribes, and (4) that the plaintiffs be awarded whatever other relief the Court deems just and reasonable.

In an unpublished Opinion and Order of January 7, 1975 (C.T. 202), the district judge denied plaintiffs all relief on the merits. Defendants, however, urged that the trial judge lacked jurisdiction and thus should not have reached the merits. On appeal, defendants continue to maintain that the district judge lacked jurisdiction due to several reasons, namely that Indian Tribes are quasi-sovereign entities which may not be sued without express Congressional consent, that no Federal Statute exists which grants jurisdiction in this particular area involving tribal elections, and that the plaintiffs did not exhaust their tribal remedies.

## I. *Jurisdiction*

In the district court, jurisdiction was allegedly based on 25 U.S.C. § 1302(8) and 28 U.S.C. § 1343(4). If the district judge properly found jurisdiction, we then consider the issues raised by plaintiffs on this appeal. (28 U.S.C. § 1291). In finding jurisdiction, the district judge concluded:

> The court is of the opinion that any action charging a violation of the Indian Civil Rights Act, 25 U.S.C. §§ 1301–03, 1311–12, 1321–26, 1331, 1341, is within the jurisdiction of the court by virtue of the provisions of 28 U.S.C. § 1343(4). That what was done may not violate the Indian Civil Rights Act is not material. The court has jurisdiction to determine whether it did or not. (C.T. 202–03)

25 U.S.C. § 1302(8) states:

> No Indian tribe in exercising powers of self-government shall—(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law.

28 U.S.C. § 1343(4) provides:

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: (4) To recover damages or to secure equitable or other relief under any Act of Congress for the protection of civil rights, including the right to vote.

In *Johnson v. Lower Elwha Tribal Community, Etc., Wash.*, 484 F.2d 200 (9th Cir. 1973), the defendant-appellee similarly argued that the district judge improperly entertained jurisdiction under 25 U.S.C. § 1302(8) and 28 U.S.C. § 1343(4). In holding that the district judge ruled correctly, Circuit Judge Trask stated:

> We are persuaded that the Indian Civil Rights Act provides a jurisdictional basis for the federal district court because the Act evidences a Congressional exception to the general policy of immunity of Indian tribes from suit. . . . The alleged conduct of the

tribe . . . . falls within § 1302(8).
. . . Appellee contends that the Act by itself is not jurisdictional. However, the pre-existing grant of jurisdiction under 28 U.S.C. § 1343(4) serves as a basis upon which to enforce alleged violations of provisions of the Indian Civil Rights Act which would, if appellee's argument were accepted, be unenforceable and thus almost meaningless. [cases cited] The rationale behind these cases, with which we agree, is that the Indian Civil Rights Act creates a substantive body of rights, patterned in part on the Bill of Rights, to "extricate the individual Indian" from decisions holding that a controversy between an Indian and his trial (sic—"tribal") government was an internal controversy. . . . This legislation at least by implication has waived whatever immunity Indian tribes had in this area prior to its enactment. 484 F.2d at 202–03. *Accord, Thompson v. Tonasket*, 487 F.2d 316 (9th Cir. 1973); *Laramie v. Nicholson*, 487 F.2d 315 (9th Cir. 1973); *see generally Settler v. Lameer*, 419 F.2d 1311 (9th Cir. 1969).

The holdings in the above cases are supported by authority in other circuits. The Fourth Circuit, relying upon our *Johnson* decision, concluded that "section 1343(4) provides a logical and specific basis of jurisdiction and to hold otherwise would render the provisions of the Act unenforceable and an exercise in Congressional futility." *Crowe v. Eastern Bank of Cherokee Indians, Inc.*, 506 F.2d 1231, 1234 (4th Cir. 1974). In *Luxon v. Rosebud Sioux Tribe of South Dakota*, 455 F.2d 698 (8th Cir. 1972), the Eighth Circuit held that "28 U.S.C. § 1343(4) gives the district court jurisdiction to determine, in a proper case, whether an Indian tribe has denied to one of its members any of the rights given to the members under the Indian Bill of Rights." 455 F.2d at 700. Similarly, in *Solomon v. LaRose*, 335 F.Supp. 715 (D.Neb.1971), the district judge concluded that "it was the intent of Congress in enacting the Indian Civil Rights Act to

create *sui generis* a body of substantive rights, patterned in part on the federal Bill of Rights, to extricate the individual Indian from the legal no man's land . . . ." 335 F.Supp. at 718. *See Loncassion v. Leekity*, 334 F.Supp. 370 (D.N.M.1971); *Spotted Eagle v. Blackfeet Tribe*, 301 F.Supp. 85 (D.Mont.1969); *Dodge v. Nakai*, 298 F.Supp. 17 (D.Ariz. 1968); Note, *The Indian Bill of Rights and the Constitutional Status of Tribal Governments*, 82 Harv.L.Rev. 1343 (1969).

Some courts, however, have expressed doubt whether the federal courts may exercise jurisdiction over tribal elections under 25 U.S.C. § 1302(8). *See Groundhog v. Keeler*, 442 F.2d 674, 682 (10th Cir. 1971). It is indeed true that 25 U.S.C. § 1302(8) "is not coextensive with the fourteenth amendment . . . ." *Wounded Head v. Tribal Council of Oglala Sioux Tribe*, 507 F.2d 1079, 1082 (8th Cir. 1975). We noted this principle in our decision in *Johnson*, observing that "[t]here may be some provisions of the Indian Civil Rights Act that under some circumstances may have a modified meaning because of the special historical nature of particular tribal customs or organization." 484 F.2d at 202 n. 4. At the same time, in that note 4, we referred to the pertinent legislative history regarding 25 U.S.C. § 1302, which was cited as follows: ". . . any Indian tribe in exercising its powers of local self-government shall, with certain exceptions, be subject to the same limitations and restraints as those which are imposed on the Government of the United States by the Constitution." *Id.* The Act's sponsor, Senator Ervin, described the purpose of the bill in the following terms:

"The reservation Indian now has no Constitutional rights. The purpose of the amendment is to give these Indians constitutional rights which other Americans enjoy."

114 Cong.Rec. 5836 (1968).

*See also* Senator Ervin's remarks concerning the Act in 1968 U.S.Code Cong. & Admin.News, pp. 1863–67.

In *White Eagle v. One Feather*, 478 F.2d 1311 (8th Cir. 1973), the Eighth Circuit dealt with a similar and almost identical issue presently before us. In that case concerning the reapportionment of elective districts, the appellants contended that the equal protection clause of 25 U.S.C. § 1302(8) should "not apply to tribal elections because there was no intent to interfere with tribal elections or office holdings . . ." 478 F.2d at 1314. In the case presently before us, plaintiffs contend that the refusal of the Tribes to declare them eligible candidates for counsel membership deprived them of their right to travel and their right to run for office in violation of the equal protection clause of 25 U.S.C. § 1302(8). In *One Feather*, the Court concluded:

We need not explore upon this record the degree to which federal courts may assert jurisdiction over tribal elections in all circumstances. Our problem has no such complexities as tribal membership or blood lines. The tribe itself, in the case before us, has established voting procedures precisely paralleling those commonly found in our culture, if not taken verbatim therefrom.

\* \* \* \* \* \*

Here, then, we have no problem of enforcing an alien culture, with strange procedures, on this tribe. What the plaintiffs seek is merely a fair compliance with the tribe's own voting procedures in accordance with the principles of *Baker v. Carr, supra,* and subsequent cases. The language of the equal protection clause in the Act is clear, its meaning (in this context) is clear, its employment subsequent to the decisions in *Baker v. Carr, supra,* has its own significance, and we can find nothing (and have been cited to nothing) in the legislative history of the Act, or, indeed, the tribal customs and culture manifesting the inapplicability of the principle. The plaintiffs are entitled to the relief they seek. 478 F.2d at 1314.

In *Daly v. United States*, 483 F.2d 700 (8th Cir. 1973), the Eighth Circuit confronted the identical issue as was before it in *One Feather.* Viewing that decision with approval, the Court held:

In *One Feather*, we held that where a tribe has adopted election procedures analogous to those found in Anglo-American culture, the equal protection clause of the Indian Civil Rights Act required that the election procedures comply with the one-man, one-vote principle established by *Baker v. Carr* . . . . We follow *One Feather* here and hold the District Court was correct in assuming jurisdiction. 483 F.2d at 704–05. *Accord, Brown v. United States*, 486 F.2d 658 (8th Cir. 1973); *Luxon v. Rosebud Sioux Tribe of South Dakota*, 455 F.2d 698 (8th Cir. 1972); *Williams v. Sisseton-Wahpeton Sioux Tribal Council*, 387 F.Supp. 1194 (D.S.D.1975); *Yellow Bird v. Oglala Sioux Tribe of South Dakota*, 380 F.Supp. 438 (D.S.D.1974).

■ We believe that the above approach, first adopted by the Eighth Circuit, promotes both the maintenance of cultural tribal identity and the preservation of fundamental constitutional rights for the individual Indian. Where the strict application of traditional equal protection doctrines would significantly impair a tribal practice or alter a custom firmly embedded in Indian culture, and where the individual injury alleged by the tribal member is, by comparison, not a grievous one, then the equal protection clause at 25 U.S.C. § 1302(8) may be implemented somewhat differently than its constitutional counterpart. Where, however, the Tribes' election and voting procedures are parallel to those commonly employed in Anglo-Saxon society, we then "have no problem of forcing an alien culture, with strange procedures, on [these tribes.]" *White Eagle v. One Feather*, 478 F.2d at 1314. The legislative history clearly indicates that the equal protection clause of the fourteenth amendment should be embraced by the Indian Civil Rights Act.

In order to determine whether Anglo-Saxon concepts of equal protection would impose elements of an alien culture upon the Indian Tribes in this particular case, we first consider the pertinent provisions of the Tribes' constitution which concern election and voting procedures:

*Article III—The Tribal Council*

\* \* \* \* \* \*

Section 6. No person shall be a candidate for membership in the Tribal Council unless he shall be a member of the Confederated Tribes of the Flathead Reservation and shall have resided in the district of his candidacy for a period of one year next preceding the election.

Section 7. The Tribal Council of the Confederated Tribes of the Flathead Reservation shall be the sole judge of the qualifications of its members.

*Article IV—Nominations and Elections*

\* \* \* \* \* \*

Section 5. Any member of the Confederated Tribes of the Flathead Reservation who is 21 years of age or over and who has maintained a legal residence for at least one year on the Flathead Reservation shall be entitled to vote.

*Article V—Vacancies and Removal from Office*

Section 1. If a councilman or official shall die, resign, permanently leave the reservation, or be removed from office, the Council shall declare the position vacant and appoint a successor to fill the unexpired term, provided that the person chosen to fill such vacancy shall be from the district in which such vacancy occurs.

■ Similar to the Eighth Circuit's holding in *One Feather*, it is unnecessary here for us to declare by a general rule the extent to which federal courts may entertain jurisdiction over tribal election and voting procedures in all circumstances. It is sufficient for us to observe that in this particular case the tribes have established procedures "paralleling those

commonly found in our culture." 478 F.2d at 1314. Thus, this is the type of case in which the Anglo-Saxon notion of equal protection is embraced by section 1302(8) of the Indian Civil Rights Act.

 In order for the district court to have properly granted jurisdiction in this matter, plaintiffs were required to show that they had exhausted their tribal remedies before bringing suit in an action predicated upon the Indian Civil Rights Act Bill of Rights, 25 U.S.C. § 1302. As stated by the Eighth Circuit in *O'Neal v. Cheyenne River Sioux Tribe*, 482 F.2d 1140 (8th Cir. 1973):

> [I]t is clear to us that Congress wished to protect and preserve individual rights of the Indian peoples, with the realization that this goal is best achieved by maintaining the unique Indian culture and necessarily strengthening tribal governments. From this perspective an exhaustion requirement is consistent with the statute. 482 F.2d at 1144–45. *Accord, Daly v. United States*, 483 F.2d 700, 705 n. 3 (8th Cir. 1973).

Similarly, the Tenth Circuit in *McCurdy v. Steele*, 506 F.2d 653 (10th Cir. 1975), held that tribal remedies must be exhausted before federal court redress is sought:

> The matter sought to be brought before the court prior to a final tribal decision does not present a controversy in justiciable form. . . . [T]here

should be given to the tribal authorities an adequate opportunity to resolve the problem. This should be done whether or not specific machinery is provided for the resolution of such a particular problem in the Goshute Constitution. 506 F.2d at 656.

In the case at bar, defendants contend that plaintiffs did not exhaust their tribal remedies prior to bringing suit in the federal district court. The relevant facts here are that plaintiffs were declared ineligible to run for council membership by the Election Committee, which is composed of five members of the Tribal Council. Plaintiffs then appealed the decision of the Election Committee to the entire Tribal Council which affirmed the decision of the Election Committee. Plaintiffs' attorney then contacted the Chief Judge of the Tribal Court who informed him that he did not believe that the Tribal Court could override a decision reached by the entire Tribal Council. Defendants argue, that on these facts, the Tribal Court should have been given a formal opportunity, in a formal proceeding, to determine the scope of its jurisdiction here. Having not been given such an opportunity to adjudicate this controversy, defendants contend that plaintiffs failed to exhaust their tribal remedies.

In determining this issue, we find the defendants' answers to particular interrogatories asked by the plaintiffs to be helpful.[1]

1.
*Interrogatory No. 9*
Please state whether there is an appeal procedure for challenging the determination of eligibility for candidacy and, if so, please set forth that procedure.
*Answer*
There is no set procedure. The individual may appeal to the Tribal Council.

*Interrogatory No. 10*
Please state by (a) who; (b) what method and (c) on what date plaintiffs were respectively officially notified of any appeal procedure of the decision of the determination of their candidacy eligibility in the December 15, 1973, election; and (d) if by written correspondence, without a motion to produce, please include a copy of that correspondence.
*Answer*

Plaintiffs know that there is no official appeal procedure in the Tribal Constitution. They also know that the Tribal Council has always acted as an appellant body whereby any tribal member who feels he has been wronged can ask for reconsideration. No one in an official capacity notified the plaintiffs of a right to appeal to the Tribal Council.

*Interrogatory No. 22*
Please state whether Judge Charles Sanders was the official acting judge of Tribal Court of Defendant Confederated Salish and Kootenai Tribes in the month of December, 1973.
*Answer*
Yes.

*Interrogatory No. 23*
If the answer to Interrogatory Number 22 is in the affirmative, please state (a) whether

■ By these interrogatories, defendants admit that the Tribal Council is the body which exercises appellate authority over matters decided by the Election Committee. Furthermore, Tribal Court Judge Sanders expressly told plaintiffs' counsel that he did not believe that the Tribal Court could reverse a decision rendered by the entire Tribal Council. Under these circumstances, it appears that it would have been futile for plaintiffs to seek redress in the Tribal Court. The exhaustion requirement is not an inflexible one. "Certainly plaintiffs bringing suit under the Indian Bill of Rights are not required to first exhaust futile or inadequate tribal remedies." *White v. Tribal Coun., Red Lake Band of Chippewa Ind.*, 383 F.Supp. 810, 812 (D.Minn.1974); *see Daly v. United States*, 483 F.2d 700, 705 (8th Cir. 1973); *Williams v. Sisseton-Wahpeton Sioux Tribal Council*, 387 F.Supp. 1194, 1198 (D.S.D.1975). We hold that plaintiffs here did exhaust all required tribal remedies before bringing suit in the district court. We therefore hold that the district judge properly took jurisdiction in this case.

## II. *The Substantive Issues*

■■ We next reach the issues which plaintiffs raise on appeal. First, plaintiffs contend that Article III, Section 7 of the Tribes' Constitution deprives plaintiffs of equal protection and due process. That section states:

The Tribal Council of the Confederated Tribes of the Flathead Reservation shall be the sole judge of the qualifications of its members (C.T. 165).

Plaintiffs submit that this provision permits the Tribal Council to judge whether aspiring candidates meet the necessary qualifications. Thus, say plaintiffs, the councilmen plaintiffs were attempting to

run against were part of the full Tribal Council which voted to uphold the Election Committee's decision. The district judge dealt with this problem by stating:

To lawyers, used to thinking of courts as the interpretative arm of government, it does seem strange that a single legislative and executive arm of government should be permitted to interpret the law, but we deal here not with state law, not with federal law, but with Indian law enacted by Indians. The Indians, except as inhibited by the Indian Civil Rights Act, are free to structure their government as they see fit. Nothing precludes the Indians from vesting, as they did, the power of interpretation in a tribal council rather than in a tribal court. (C.T. 205).

We agree with this rationale. So long as the Tribes do not violate the Indian Civil Rights Act, they may structure their government in any manner they please. If the plaintiffs had been able to prove that the vesting of this discretion to the entire Tribal Council deprived them of either due process or equal protection under 25 U.S.C. § 1302(8), then Article III, Section 7 of the Tribes' Constitution should be declared invalid as violative of the constitutional rights of Indians. This burden plaintiffs failed to carry. They offered no admissible evidence which tended to show that they were treated differently or unfairly by the Tribal Council. Hence, plaintiffs' contention that Article III, Section 7 violates 25 U.S.C. § 1302(8) must fail. *See generally Laramie v. Nicholson*, 487 F.2d 315 (9th Cir. 1973); *Johnson v. Lower Elwha Tribal Community, Etc., Wash.*, 484 F.2d 200 (9th Cir. 1973).

Plaintiffs' second contention attacks the constitutionality of Article III, Sec-

said Judge Sanders conversed by telephone with Counsel for Plaintiffs, Paul B. Smith, on or about December 11, 1973 concerning the availability of the Tribal Court to hear the matter involved in this action; (b) the response of Judge Sanders to the request by Paul B. Smith to hear the matter involved in this action in the tribal court.
*Answer*

(a) Judge Sanders recalls talking on the telephone with an attorney named Paul B. Smith on or about December 11, 1973; (b) Judge Sanders stated that the Tribal Council held a meeting and said Howlett was not eligible. He further stated that he did not think the Tribal Court could override what the Council had said because it was a full council.

tion 6 of the Tribes' Constitution which provides:

> No person shall be a candidate for membership in the Tribal Council unless he shall be a member of the confederated Tribes of the Flathead Reservation and shall have *resided* in the district of his candidacy for a period of one year next preceding the election. (emphasis added) (C.T. 165).

The District Judge found that Howlett was physically absent from the reservation for a period of approximately six months and that Clairmont was physically absent for approximately five and one-half months in the year immediately preceding the election. (C.T. 204).

In defining the word "resided" within the provisions of Article III, Section 6, the District Judge stated:

> The word "residence" "has an evasive way about it, with as many colors as Joseph's coat. It reflects the context in which it is found. . . ." It may be equated with "domicile" meaning "that place where a man has his true, fixed, and permanent home and principal establishment, and to which whenever he is absent he has the intention of returning." A domicile is usually not changed by absence due to military service or attendance in college. Given this meaning I find that the plaintiffs did reside on the reservation for a period of one year next preceding the election.
>
> The word "reside," however, may signify "the place where the candidate has actually lived and maintained a home and where he was personally present." It is this meaning which the trial council gave the word. [footnotes omitted] (C.T. 204).

By the action of the Tribal Election Committee, later formally approved by the Tribal Council, plaintiffs were disqualified as candidates for the Tribal Council because they had failed to satisfy the Tribes' residency requirements. There is ample evidence in the record to support the finding that the term "resided in the district of his candidacy for a period of one year next preceding the

election" within Article III, Section 6 has been interpreted by the Tribes to signify the following:

> "[R]esidence in the district of his candidacy for a period of one year next preceding the election," means actual residence. No allowance may be made for absence for military service, school attendance, work, or otherwise. The allowance for absence due to the above are for enrollment and voting purposes and not made for candidates for a position on the council or the Constitutional Convention Committee. *See* Interrogatory 12 and Answer thereto by the Tribe. (C.T. 43). Letter of Secretary of Tribe, Attachment B to Interrogatory. (C.T. 49).

On appeal, plaintiffs argue that the trial court erred in holding that there was legal precedent for the tribal council's definition of residency. They cite a number of cases which purportedly hold that a person who temporarily leaves his district but always entertains the intent to return to his original home and maintains voting residence in that district, qualifies to run as a candidate from that district. *See, e. g., Frakes v. Farragut Community School District,* 255 Iowa 88, 121 N.W.2d 636 (1963); *Wilson v. Hoisington,* 110 Mont. 20, 98 P.2d 369 (1940).

In asserting the above argument, we repeat that plaintiffs must recognize that *the Tribes may structure their government in any manner they choose so long as the Indian Civil Rights Act is not violated.* In his decision, the district judge noted:

> If the word "reside" is given a meaning of physical presence, which the tribal council has given it, then I find not unreasonable the ultimate decision of the council that the physical presence of these plaintiffs on the reservation in the year next preceding the election was insufficient to qualify them as candidates for office. (C.T. 205).

Plaintiffs claim there existed no legal precedent for the tribal council's definition of residency. But such an allegation *by itself* does not reach consti-

tutional dimension. As stated by the Eighth Circuit in *Wounded Head v. Tribal Council of Oglala Sioux Tribe*, 507 F.2d 1079, 1083 (8th Cir. 1975):

> Congress has exclusive and plenary power to enact legislation with respect to the Indian tribes. In the absence of a constitutional mandate or express legislation by Congress to the contrary, a tribe has complete authority to determine questions such as the one here under consideration. Congress has failed to enact legislation authorizing members of the Sioux Tribe between the ages of eighteen and twenty-one to vote, and the ICRA does not expressly or impliedly require the Tribal Council to permit plaintiffs to vote at a tribal election.

Similarly here, neither a constitutional mandate nor legislation by Congress requires that the Tribes define "residency" in any particular way. Indeed, the requirements of preserving Indian cultural identity or tribal integrity may require a rather particularized definition of residency in a case such as this. Accordingly, the definition of residency under Article III, Section 6 to mean actual physical presence does not, on its face, violate any provisions of the Indian Civil Rights Act.

It is also pertinent to note that in Article IV, Section 5 of the Tribes' Constitution, a member is entitled to vote if he has maintained "a legal residence" for a period of at least one year *on the Flathead Reservation*. To be a candidate for the Tribal Council, however, Article III, Section 6 requires that the member "shall have resided" in one of the eight districts for a period of one year next preceding the election. This distinction, we believe, inferentially recognizes that the Tribes draw a valid distinction between the right to vote and the right to hold office.

■ Given that "resided" within Article III, Section 6 of the Tribes' Constitution is interpreted as actual presence, plaintiffs contend that such a provision violates their fundamental constitutional rights, such as the right to travel and

the right to seek office, which are both protected by the Indian Civil Rights Act. We shall assume without deciding that Article III, Section 6 does prima facie abridge these fundamental constitutional rights.

In the district court below, the judge applied the compelling state interest test in determining whether the Tribes' durational residency requirement was violative of the Indian Civil Rights Act. (C.T. 206). Defendants submit that in order to affirm the district court on the merits, this Court need not find that the tribal residency requirement meets *a compelling tribal interest*, but only that it is *reasonably related to a legitimate tribal interest*.

■ We conclude that the district judge was correct in subjecting the residency requirement to the compelling interest test. The recent Supreme Court decision in *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), dealt with the constitutionality of durational residence requirements as prerequisites for registration to vote:

> [D]urational residence laws must be measured by a strict equal protection test: they are unconstitutional unless the State can demonstrate that such laws are " *necessary* to promote a *compelling* governmental interest."

> \* \* \* \* \* \*

> It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. 405 U.S. at 342–43, 92 S.Ct. at 1003.

Although we realize that "the right to vote and the right to seek public office are not synonymous," *Sununu v. Stark*, 383 F.Supp. 1287, 1291 (D.N.H.1974), we are also aware that the vast majority of courts which have considered this issue have applied the compelling governmental interest test. This conclusion applies both to those cases which have held that

durational residency requirements regarding candidates to be constitutional, *e. g., Chimento v. Stark*, 353 F.Supp. 1211 (D.N.H.1973), *aff'd*, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973); *Draper v. Phelps*, 351 F.Supp. 677 (W.D.Okl. 1972); *Hadnott v. Amos*, 320 F.Supp. 107 (M.D.Ala.1970), *aff'd*, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971), *aff'd*, 405 U.S. 1035, 92 S.Ct. 1304, 31 L.Ed.2d 576 (1972); and those courts which have found the particular durational residency law to be unconstitutional, *Alexander v. Kammer*, 363 F.Supp. 324 (E.D.Mich. 1973); *McKinney v. Kaminsky*, 340 F.Supp. 289 (M.D.Ala.1972); *Bolanowski v. Raich*, 330 F.Supp. 724 (E.D.Mich. 1971).

The Sixth Circuit, in testing the constitutionality of a two-year residency requirement for candidates running for city office (Plymouth, Michigan), declared that the durational residency classification "requires that the requirement be strictly scrutinized . . . ." *Green v. McKeon*, 468 F.2d 883, 884 (6th Cir. 1972). Similarly, the First Circuit has held that any legislative classification that significantly burdens the right to run for office "must be subjected to strict equal protection review." *Mancuso v. Taft*, 476 F.2d 187, 196 (1st Cir. 1973).

We agree with the rationale of the above cases, applying the compelling state interest test. Here, we assume without deciding that the plaintiffs' rights of travel and running for office are protected by the provisions of 25 U.S.C. § 1302(8). Because the Tribes' election and voting procedures are analogous to Anglo-Saxon culture, it is clear that in this case the equal protection clause of the fourteenth amendment should be embraced by the Indian Civil Rights Act. *See White Eagle v. One Feather,* 478 F.2d 1311, 1314 (8th Cir. 1973), and other relevant cases cited in discussion *supra* regarding jurisdiction. It is settled law that absent a compelling state interest, governmental action may not burden the exercise of a fundamental constitutional right. *Dunn v. Blum-stein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). Accordingly, the district court applied the proper test in this case, that of "compelling tribal interest."

In applying the compelling interest test, the district judge upheld the Tribes' one year residency requirement. The defendants contend that the district court's holding was correct and supported by two compelling interests. First, the political and managerial responsibilities placed on the members of the Tribal Council can be discharged responsibly only with the benefit of the full knowledge and information that can be acquired only by almost daily living on the reservation. Second, the cultural identity of the Salish and Kootenai Tribes is primarily a product of continued physical presence on the reservation, and the elected leaders of the Tribe must be current and long-term actual residents (i. e., at least one year) in order to insure that they are sufficiently familiar with and part of that culture in order to be entrusted to carry it forward.

In holding that the State of Alabama had a compelling state interest in imposing substantial pre-election residence requirements for state circuit judges, a three-judge federal district court made an astute observation which is relevant to the case at bar:

We consider it to be of urgent importance that the voters have an opportunity to observe, learn about and appraise those who seek to be candidates for a key judicial office that touches important events and relationships of their lives and of the community in which they live. There are innumerable qualities and qualifications that are relevant.

The democratic process contemplates that the voters shall make a choice. In the case of this important judicial office the state has a compelling interest in attempting to see that the voters have the opportunity that their

choice be an informed one. Assertion of the state interest will bring imperfect results. Less than all voters will observe, learn and rationally choose, but this is not to deny to the state its interest in extending the opportunity.

The particular significance of exposure by residence is demonstrated in this case. The three counties are rural and sparsely populated. There is no television station in the circuit, one radio station, no daily newspaper. Necessarily communication between candidate and voter is personal and personalized. Information which under other circumstances might be communicated by more formal means necessarily is communicated informally by personal acquaintance and observation, by word of mouth from neighbor to neighbor. The voters acquire general community knowledge about the candidate, while at the same time the candidate builds a community reputation concerning many of the traits to which we above referred. These are processes which cannot operate overnight. But they represent appropriate functioning of democracy.

[The candidate] must have the special capacities that will enable him to perform the office he seeks, and his possession or lack of possession of those capacities need to be exposed to those who will make the choice. Nonexposure of . . . candidates with voters choosing from lack of knowledge, is a much more serious strain on the sinews of democracy. *Hadnott v. Amos*, 320 F.Supp. 107, 120–22 (M.D. Ala.1970), aff'd, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971), aff'd, 405 U.S. 1035, 92 S.Ct. 1304, 31 L.Ed.2d 576 (1972); see *Chimento v. Stark*, 353 F.Supp. 1211, 1215–16 (D.N.H.1973), aff'd, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973); *Draper v. Phelps*, 351 F.Supp. 677, 683–84 (W.D.Okl. 1972).

The case presently before us, even more so than the previously cited cases, presents a situation where compelling interests justify the imposition of a one-year durational residency requirement upon candidates. The extremely localized problems of the Tribes intensify the need for exposure of prospective candidates to the constituency for a substantial period of time as a prerequisite to Tribal Council eligibility. The Tribes have a great interest in promoting serious and knowledgeable candidates for Tribal Council positions, and in providing the electorate with the opportunity to observe and acquire first-hand knowledge of prospective candidates. These goals can only be achieved through the imposition of substantial durational residency requirements. We therefore agree with the holding reached by the district judge below that "the one-year requirement is justified for an office as important to the Tribes as is that of tribal councilman." (C.T. 206). This requirement does not extend beyond its justification, however. Nothing we have said is intended to suggest that we would look with approval upon an interpretation of the requirement that makes inconsequential absences from the reservation, such as overnight or weekend absences, a disqualification for candidacy. Such an interpretation is not before us. Nor have we been concerned in this case with discriminatory applications of the requirement. The plaintiffs have made no such allegations.

We, also, emphasize that plaintiffs are not barred from becoming eligible candidates in the future. Their candidacy is only delayed—not barred. A period is allotted for them to become familiar,— and for the electorate to be assured that the candidates are well acquainted—with the unique problems encountered in promoting Indian cultural identity and administering their own unique tribal government.

We affirm the district court's Opinion and Order denying plaintiffs all relief on the merits.

Affirmed.