540 F.2d 1039
 Julia MARTINEZ, on behalf of herself and all others
similarly situated, and Audrey Martinez, on behalf
of herself and all others similarly
situated, Plaintiffs-Appellants,
v.
SANTA CLARA PUEBLO, and Lucario Padilla, Individually and as
Governor of the Santa Clara Pueblo, Defendants-Appellees.
Association on American Indian Affairs, Inc., et al., Amici Curiae.
 No. 75-1615.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted May 19, 1976.
Decided Aug. 16, 1976.
 
 Richard B. Collins, Window Rock, Ariz. (Alan R. Taradash and Tim Vollmann, Window Rock, Ariz., on the brief), for plaintiffs-appellants.
 Marc Prelo, Jr., Albuquerque, N. M. (Richard J. Grodner, Albuquerque, N. M., on the brief), for defendants-appellees.
 Arthur Lazarus, Jr., Washington, D. C., for Amici Curiae, Association on American Indian Affairs, Inc., and The Seneca Nation of Indians of New York.
 Marvin J. Sonosky, Washington, D. C., for Amicus Curiae, Shoshone Indian Tribe of the Wind River Reservation, Wyoming; W. Richard West, Jr., Washington, D. C., of counsel.
 Philip R. Ashby, Albuquerque, N. M., for Amicus Curiae, Pueblo of Laguna; Richard Schifter, Washington, D. C., of counsel.
 Before BARRETT and DOYLE, Circuit Judges and STANLEY,* District Judge.
 DOYLE, Circuit Judge.
 
 
 1
 This case draws into question the validity of a membership ordinance of the Santa Clara Pueblo in New Mexico. The challenge is by appellants, on behalf of themselves and others similarly situated. This appellant class is composed of female members of the Pueblo, who are married to non-members, together with their children. Appellees, on the other hand, are the Pueblo and Lucario Padilla, individually and as governor of the Pueblo. The ordinance grants membership in the Pueblo to "(a)ll children born of marriages between male members of the Santa Clara Pueblo and non-members. . . ." It precludes membership for "(c)hildren born of marriages between female members of the Santa Clara Pueblo and non-members. . . ." Appellants have alleged that the ordinance contravenes the equal protection and due process provisions of the Indian Civil Rights Act of 1968, 25 U.S.C. Section 1302(8).[1] In a trial to the court the decision was in favor of defendants. Martinez v. Santa Clara Pueblo, 405 F.Supp. 5 (D.N.M.1975).
 
 
 2
 The subject membership ordinance was enacted on December 15, 1939, in response to a marked increase in marriages between Pueblo members and non-members. Prior to 1930 these had been rare. Prior to the enactment, membership in the Pueblo for children of mixed marriages had been determined on an individual basis. In addition, witnesses for the Pueblo testified that there had been several instances, prior to 1939, in which the offspring of female line mixed marriages had been granted membership. The increase in mixed marriages produced concern about the enlarged demands for allocation of land and other tribal resources. The Pueblo's elders were apprehensive that the population increase resulting from intermarriage would strain the Pueblo's finite resources. It was, then, in response to the economic consequences of mixed marriages that the Pueblo Council determined that the offspring of female line mixed marriages would be denied membership while the offspring of male line mixed marriages would be admitted to membership.[2]
 
 
 3
 Appellant Julia Martinez, whose parents were Santa Clarans, is a member of the Pueblo. Her husband is a full-blooded Navajo and is not a member of the Pueblo. Their eight living children, including appellant Audrey Martinez, are as a result of the ordinance barred from membership in the Pueblo. The Martinezes have lived at the Pueblo continuously since their marriage in 1941. All of the Martinez children were reared at the Pueblo; all speak Tewa, the traditional and official language of the Pueblo; all are allowed to practice the traditional religion. In effect, the Martinez children are, culturally, members of the Pueblo.
 
 
 4
 Since 1946, Ms. Martinez has attempted to enroll her children in the Pueblo through all of the procedures available under the Pueblo government. When her resort to Pueblo remedies proved unavailing, she brought this action.
 
 
 5
 Appellants have alleged that the ordinance deprives the non-member children of various rights, including residence at the Pueblo as a matter of right; certain political rights, such as voting, holding secular office, bringing matters before the Pueblo Council; sharing in the material benefits of Pueblo membership, such as using the land, hunting and fishing. Appellants also contended that the ordinance prevents Ms. Martinez from passing her possessory interest in land[3] on to her children.
 
 
 6
 The trial court ruled for the Tribe, holding that the ordinance did not violate the Indian Civil Rights Act. Judge Mechem recognized the Pueblo's interest in membership policies generally and in the 1939 ordinance specifically and noted that if the Pueblo's ability to define who is a Santa Claran is limited or restricted, the Pueblo's culture would be changed. He recognized also the legitimacy of the Pueblo's interest in its economic survival and that economic survival and cultural autonomy are interrelated, i. e., economics affects the Pueblo's ability to maintain its cultural autonomy and identity. While Judge Mechem found that the ordinance had no bearing on Pueblo religion, he did find that the male-female distinction was "rooted in certain traditional values," 402 F.Supp. at 16 the Pueblo's patrilineal and patrilocal traditions. In assessing the scope of the Indian Civil Rights Act, Judge Mechem found that the scope of the Act's equal protection provision was not coterminous with the constitutional guarantee of equal protection. ". . . (T)he Act and its equal protection guarantee must be read against the background of tribal sovereignty and interpreted within the context of tribal law and custom." Id. at 17. He concluded "that 25 U.S.C. Section 1302(8) should not be construed in a manner that would invalidate a tribal membership ordinance when the classification attacked is one based on criteria that have been traditionally employed by the tribe in considering membership questions." Id. at 18, and that, thus, the ordinance did not deny appellants equal protection within the meaning of the Indian Civil Rights Act.
 
 
 7
 The issues to be considered on this appeal are: one, the sovereign immunity of the Pueblo and whether this court has jurisdiction to entertain the cause; and two, the legal standard applicable to claims of denial of equal protection under the Act. Third, we must decide whether the ordinance conflicts with the Civil Rights Act and, if so, whether the Act is to prevail or must give way to tribal authority.
 
 I.
 
 8
 WHETHER THE COURT HAS JURISDICTION TO ENTERTAIN THE CAUSE
 
 
 9
 The Tribe maintains that sovereign immunity precludes this suit. It also argues that the Indian Civil Rights Act does not furnish a jurisdictional basis. We disagree. We have previously considered these arguments and have ruled that jurisdiction exists. Dry Creek Lodge, Inc. v. United States, 515 F.2d 926 (10th Cir. 1975). We also held that to the extent that the Indian Civil Rights Act applies, tribal immunity is thereby limited. Dry Creek Lodge, Inc. v. United States, supra at 934, n. 9. On the question of jurisdiction we said that 28 U.S.C. Section 1343(4) which provides for district court jurisdiction over actions brought under "any Act of Congress providing for the protection of civil rights" constituted an appropriate jurisdictional basis for actions under the Indian Civil Rights Act. Dry Creek Lodge, Inc. v. United States, supra at 933, n. 6, citing cases. Finally, since this Act of Congress was designed to provide protection against tribal authority, the intention of Congress to allow suits against the tribe was an essential aspect. Otherwise, it would constitute a mere unenforceable declaration of principles.
 
 II.
 
 10
 THE MEANING TO BE GIVEN TO EQUAL PROTECTION OF THE LAWS AS
 
 PROVIDED IN THE INDIAN CIVIL RIGHTS ACT
 
 11
 A. Legislative History.
 
 
 12
 The Act of Congress in question which is found at 25 U.S.C. Section 1302, undertakes to single out the more important civil rights contained in the Constitution and to render those applicable to tribal members who reside on the reservation. The pertinent portion of the equal protection clause has been, as is apparent from n. 1 above, selected as one of the specific protections adopted.[4]
 
 
 13
 The question is whether Congress intended to make the above clause, as it affects the rights of Indian people in relationship to their tribal government, co-extensive with the Federal Constitutional provision (Amendment XIV), which guarantees equal protection to all citizens including Indians. If full constitutional protection is not provided by the Act, to what extent does it furnish protection against discrimination which would under constitutional standards be held invidious and violative?[5]
 
 
 14
 The Indian Civil Rights Act of 1968 was the product of considerable study, most of which was conducted during 1961-63 by the Subcommittee on Constitutional Rights of the Senate Judiciary Committee (1961-63 Hearings).[6] The authorizing Senate Resolution 53 was broad. It allowed the investigation to extend to "all matters pertaining to civil rights." 107 Cong.Rec. 997 (1961). The Subcommittee carried on a broad inquiry into Indians' constitutional rights in relation to tribal, State, and Federal authority.
 
 
 15
 The numerous abuses and denials of constitutional rights which were found to exist led to the introduction in 1965 of a series of bills designed to safeguard Indians' constitutional rights. See S.Rep. No. 841, 90th Cong., 1st Sess. (1967), pp. 5-6. The bill most pertinent to the case at bar was S. 961 which provided that an Indian tribe in exercising its powers of local self-government was subject to the same limitations and restraints as those which are imposed on the Governments, Federal and State, by the United States Constitution. The broad scope of the hearings is apparent from the Committee's report.[7] As a result of the testimony taken, the original bill which generally imposed constitutional limitations on Indian tribes was amended so as to specify particular guarantees. See n. 1, supra. This amended bill was reported to the full Senate in S.Rep. No. 841, 90th Cong., 1st Sess. (1967), and it passed unanimously, 113 Cong.Rec. 35471-77 (1967), as S. 1843. After that the House of Representatives conducted hearings.[8] Senator Ervin, the bill's chief sponsor in the Senate, became impatient with the slowness of the House of Representatives. He amended S.1843 into the House civil rights bill (H.R. 2516), which was then pending in the Senate. 114 Cong.Rec. 5835-38 (1968). The bill, together with the Indian Civil Rights amendment, passed the Senate. 114 Cong.Rec. 5992 (1968). The House accepted the amendment, 114 Cong.Rec. 9621 (1968), and the measure became law as Title II of the Civil Rights Act of 1968. The provisions extending these specific rights to Indians are codified at 25 U.S.C. Section 1302.
 
 
 16
 The congressional hearings gave little attention to constitutional rights other than protection under the criminal law and procedure of individuals in the tribal courts. Also, another area in which the Congress was particularly preoccupied was protecting generally the rights of individual Indians against infringement by tribal government. One proposal brought out in the 1965 hearings on S. 961 would have made tribal governments fully subject to all constitutional restraints and requirements, but this was rejected due to the complexity of giving equality in voting rights which might conflict with tribal blood quantum requirements for membership and voting. Also, the First Amendment non-establishment clause, it was pointed out, would endanger the continued existence of Pueblo theocracies. 1965 Hearings 65, 221. But no such limitations were suggested with respect to equal protection which was frequently characterized as a basic or fundamental right among the guarantees. E. g., 1965 Hearings 18, 61.
 
 
 17
 In response to criticism calling for enumeration of constitutional protections being extended to Indians, e. g., 1965 Hearings 17, 65, 961, the Subcommittee amended the bill in order to delete the non-establishment clause and the Fifteenth Amendment as well as to specify the constitutional guarantees granted from the First and Fourth through Eighth Amendments plus the equal protection guarantee of the Fourteenth Amendment. S. 1843; Indian Civil Rights Act of 1968, 25 U.S.C. Section 1302. This furnishes evidence that the Congress actually considered the various rights contained in the Bill of Rights and retained those which it considered essential and eliminated those parts which it deemed to be out of harmony with Indian culture.
 
 
 18
 There were conflicting statements regarding refraining from undermining tribal authority. E. g., 1961-63 Hearings 5, 287. But the Subcommittee members stated at the hearings, in Committee reports and in floor debates, their intent to extend broad constitutional protections to individual Indians. Senator Ervin stated that S. 961 was intended to insure that individual Indians had the same rights against tribal authorities as other American citizens had under the Constitution. It was pointed out by others that off the reservation Indians had the same rights as other American citizens, but on the reservation their rights depended upon the benevolence of the tribal government. E. g., 1961-63 Hearings, 3, 8, 286, 447; 1965 Hearings, 165, 221.[9] During the floor debate Senator Ervin said that the purpose of the bill was "to confer upon the American Indians the fundamental constitutional rights which belong by right to all Americans." 113 Cong.Rec. 35473 (1967).
 
 
 19
 The legislative history was not strictly limited to protection of individuals in tribal courts. There was attention given to the guarantee of the exercise of religious freedom. Instances were cited in which there had been deprivations of religious freedom and also there was evidence that actions in United States courts brought to vindicate these violations had failed on the ground that constitutional requirements were inapplicable to tribal governments.[10] This moved the Congress to retain the free exercise of religion among the protections extended to Indians, the adoption of which had the effect of overruling the decisions which had been rendered prior to the enactment of the Indian Bill of Rights. See n. 10; 1965 Hearings 223; and see S.Rep. 841, pp. 7-11.
 
 
 20
 The legislative history is not free of evidence that Congress considered that in an evaluation such as the present one the cultural autonomy and integrity of the tribes were entitled to be weighed. Thus, the deletion of the nonestablishment clause and the Fifteenth Amendment appears to have been in deference to the traditional Indian culture. At the same time nothing resembling a formula for determining which of these conflicting interests is to prevail has been furnished.
 
 
 21
 It is significant that the Pueblos opposed the legislation in question. They regarded it as an effort to import into the tribal government the standards of United States constitutional law. The effect of this would, of course, be to undermine tribal law.
 
 
 22
 About the only way to resolve this conflict is to recognize the necessity to evaluate and weigh both of these interests. Thus the scope, extent and importance of the tribal interest is to be taken into account. The individual right to fair treatment under the law is likewise to be weighed against the tribal interest by considering the clearness of the guarantee together with the magnitude of the interest generally and as applied to the particular facts. See Note: The Indian Bill of Rights and the Constitutional Status of Tribal Governments, 82 Harv.L.Rev. 1343, 1355-60 (1969). The concern of Congress was to protect against serious deprivations of constitutional rights while giving as much effect as the facts would allow to tribal autonomy.
 
 
 23
 As a result of this comparative weighing, the question which we must answer is whether an ordinance such as the present one which differentiates between the rights of men and the rights of women and which is clearly subject to subsection (8), the equal protection clause of the Indian Bill of Rights, can be upheld. A study of the legislative history, while it gives some guides and suggestions, fails to provide a conclusive answer to the ultimate question presented in the case. The legislative proceedings do manifest a congressional intent to recognize the specific guarantee unless the tribal custom or principle outweighs the specific guarantee. In view of at least limited uncertainty, we proceed to a consideration of the positive decision law touching the subject.
 
 
 24
 B. Consideration of the Precedents.
 
 
 25
 The extent to which the equal protection clause of subsection (8) of the Indian Bill of Rights affords protection to affected persons such as the appellants is a novel question. While the decided cases have taken up and considered the equal protection clause in connection with related problems, no court has come to grips with the issue of discrimination by a tribe against Indian women. And so we ask the question whether a tribe may extend to men members fundamental rights while simultaneously denying the same rights to its women.
 
 
 26
 There are cases which say that Congress did not intend in enacting the Indian Civil Rights Act to subject a tribe to identical compulsions as those which are exacted under the equal protection clauses of the Fourteenth and Fifth Amendments to the Constitution of the United States.[11] That is not the same as saying that men can be preferred over women in a substantial way.
 
 
 27
 One example in which the equal protection standard comes into play but in which the discrimination is less pronounced is in the cases dealing with the quantum of Indian blood as a criterion for tribal membership. Under the Constitution this type of case would constitute a violation. See for example Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Courts have, however, had little trouble in upholding these requirements when they have been challenged under the Indian Civil Rights Act. See Slattery v. Arapahoe Tribal Council, 453 F.2d 278 (10th Cir. 1971), involving the requirement that tribal members possess one-quarter degree Indian blood. There was also the one-quarter requirement in Daly v. United States, 483 F.2d 700 (8th Cir. 1973). One-half degree was upheld for office-holding in the Crow Creek Sioux in the same decision.
 
 
 28
 The fact that the blood quantum requirement has been sustained furnishes little basis for upholding the discrimination in the case at bar because there is some semblance of basis for the classification. This is in terms of ancestral lines and in maintaining the integrity of the membership. Congress itself has employed these requirements in its definitions and other measures. E. g., 25 U.S.C. Sections 1262, 1300e-1, 3 (1972 laws governing distribution of judgment funds to Indian tribes); Act of June 28, 1898, Section 21, 30 Stat. 495, 502-03 (enrollment criteria for Cherokee Indians).
 
 
 29
 We have examined the various other areas in which subsection (8) has been applied. Invariably the courts look to the Fourteenth Amendment to the Constitution as a guide. This is true in the election requirement cases both for voting and holding office,[12] in the apportionment of tribal legislatures,[13] residency requirements for voting and holding office,[14] and irregularities in the conduct of an election.[15]
 
 
 30
 The interest of the Tribe in maintaining its integrity and in retaining its tribal cultures is entitled due consideration. See Means v. Wilson, 522 F.2d 833 (8th Cir. 1975). And where the tribal tradition is deep-seated and the individual injury is relatively insignificant, courts should be and have been reluctant to order the tribal authority to give way. See Howlett v. The Salish and Kootenai Tribes, 529 F.2d 233 (9th Cir. 1976).
 
 
 31
 It is conceded that if the validity of the instant ordinance were to be measured by the Fourteenth Amendment alone, it would have to be held violative because it draws its classification lines solely on the basis of sex. The offspring of a mixed marriage in which the woman is a Santa Claran are, by the terms of the ordinance, disqualified from membership in the Pueblo. Where, however, the man is a member of the Santa Clara Pueblo, the offspring of this mixed marriage suffer no such disability. An enactment which works this kind of discrimination violates the equal protection clause of the United States Constitution. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). See also Stanton v. Stanton, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); Weinberger v. Weisenfeld, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).
 
 
 32
 The Fourteenth Amendment standards do not, however, apply with full force. They do, nevertheless, serve as a persuasive guide to the decision. The history and decisions teach us that the Indian Bill of Rights is modeled after the Constitution of the United States and is to be interpreted in the light of constitutional law decisions.
 
 
 33
 But we must still ask: is the Tribe justified in deviating from the Fourteenth Amendment standard on the basis that tribal, cultural and ethnic survival would suffer from full-scale enforcement of subsection (8) to these facts? We must hold that the facts do not support a decision that the Tribe's interest is compelling. The children of Julia and Myles Martinez are 100 percent Indian and 50 percent Santa Claran. They speak the language of the Santa Clara Pueblo, namely, Tewa. They practice the customs of the Tribe and are accepted into the Tribe's religion; nevertheless, they are denied membership and face exclusion with attendant loss of rights of inheritance, residency and voting, together with ability to pass tribal membership to their offspring, solely because their mother rather than their father is a Santa Claran. Compare this with the rights that are accorded the male member of the Santa Clara Pueblo. Even if he marries outside the Pueblo one who is not an Indian, and even though his family resides outside the territory of the Tribe, the offspring are entitled to tribal membership. The Tribe has not shown how such an incongruous and unreasonable result fosters and promotes cultural survival.
 
 
 34
 The contention is that the culture is patrilineal, patrilocal or patricultural. These, however, are conclusory characterizations. What is the history? The ordinance was passed in 1939 to deal with an unprecedented phenomenon, namely, mixed marriages on a relatively wide scale which resulted from Indians of different tribes meeting and encountering one another in Indian schools. An added element was Indians becoming acquainted while employed off the reservation. They met not only Indians from other tribes, but Anglos as well. Traditionally the Santa Clara female moved to the house of the Santa Clara husband and undoubtedly the Santa Clara male played a large role in educating the children in the Pueblo's traditions. This is the strongest argument in favor of the Tribe, but it falls short of justifying sex discrimination since there could have been a solution without discrimination. It is important to note also that prior to the adoption of this ordinance the mixed marriage problem was dealt with on an individual case basis. The evidence shows that under this policy there were situations in which the offspring of a Santa Clara woman were admitted to the Pueblo and so historically the 1939 ordinance cannot be said to represent the Santa Clara tradition.
 
 
 35
 There is evidence that the ordinance was the product of economics and pragmatics. It appeared to the governing body of the Tribe that the offspring of mixed marriages threatened to swell the population of the Pueblo and diminished individual shares of the property. If this were the pressing problem it could have been solved without resorting to discrimination by simply excluding the offspring of both sexes where the parent, either male or female, married outside the Pueblo.
 
 
 36
 We do not deny that the power to control and define tribal membership is important in preserving the Tribe's culture and ethnic identity. 402 F.Supp. at 15. Also of great importance is the interest of the individual Indian in tribal membership. His interest extends to living in a particular cultural setting in close relationship with fellow members, inheriting tribal rights, and enjoying federal and other incidental benefits. See Morton v. Mancari, 417 U.S. 535, 553 n. 24, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). But if the equal protection clause of the ICRA is to have any consequence, it must operate to ban invidious discrimination of the kind present in this case.
 
 
 37
 The effect of the ordinance under attack is not to exclude cultural outsiders from the Santa Clara Pueblo. The Martinez children and many others of the class "have been brought up on the Pueblo, speak the Tewa language, participate in its life, and are, culturally, for all practical purposes, Santa Clara Indians." 402 F.Supp. at 18. They are persons within the cultural group who have been allowed to develop a substantial stake in the life of the Tribe.
 
 
 38
 The express terms and conditions of subsection (8) purport to guarantee equal justice. Congress could have couched this provision in different terms if it had not intended to enact an effective provision. It did not do so. It is not for us to say that the meaning is unclear or that some other effect was intended. We must conclude that subsection (8) means what it says and that the ordinance is out of harmony with it. The instant tribe policy is of relatively recent origin and so it does not merit the force that would be attributable to a venerable tradition. Also, inasmuch as it originates from practical economic considerations, it becomes an arbitrary and expedient solution to the problem which was then confronting the Tribe. In sum, if we were to approve their ordinance and in turn approve this plain discrimination, it would be tantamount to saying that the Indian Bill of Rights is merely an abstract statement of principle.
 
 
 39
 The judgment of the district court is reversed and the cause is remanded for further proceedings.
 
 
 
 *
 Of the District of Kansas, sitting by designation
 
 
 [1]
 The statute provides, in pertinent part, that:
 No Indian tribe in exercising powers of self-government shall
 (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law; * * *.
 25 U.S.C. Section 1302(8).
 
 
 [2]
 The ordinance is as follows:
 Be it ordained by the Council of the Pueblo of Santa Clara, New Mexico, in regular meeting duly assembled, that hereafter the following rules shall govern the admission to membership to the Santa Clara Pueblo:
 
 
 [1]
 All children born of marriages between members of the Santa Clara Pueblo shall be members of the Santa Clara Pueblo
 
 
 [2]
 All children born of marriages between male members of the Santa Clara Pueblo and non-members shall be members of the Santa Clara Pueblo
 
 
 [3]
 Children born of marriages between female members of the Santa Clara Pueblo and non-members shall not be members of the Santa Clara Pueblo
 
 
 [4]
 Persons shall not be naturalized as members of the Santa Clara Pueblo under any circumstances
 Appellants are attacking sub-paragraphs 2 and 3 of the ordinance.
 
 
 [3]
 The Pueblo holds all of the land within the Pueblo's boundaries in fee simple title in common pursuant to an 1858 Act of Congress. 11 Stat. 374; New Mexico v. Aamodt, 537 F.2d 1102, 1111 (10th Cir., filed June 28, 1976). Individual members, however, are granted possessory interests in tracts of land which they may pass on to their descendants. The devolution of the possessory interests does not diminish the Pueblo's superior proprietary right
 
 
 [4]
 The Act as it was finally passed, H.R. 2516, Title II (25 U.S.C. Section 1302), reads as follows:
 Title I Rights of Indians
 Definitions
 Sec. 101. For purposes of this title, the term
 (1) "Indian tribe" means any tribe, band, or other group of Indians subject to the jurisdiction of the United States and recognized as possessing powers of self-government;
 (2) "powers of self-government" means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and
 (3) "Indian court" means any Indian tribal court or court of Indian offense.
 Indian Rights
 Sec. 102. No Indian tribe in exercising powers of self-government shall
 (1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;
 (2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;
 (3) subject any person for the same offense to be twice put in jeopardy;
 (4) compel any person in any criminal case to be a witness against himself;
 (5) take any private property for a public use without just compensation;
 (6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;
 (7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of six months or a fine of $500, or both;
 (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;
 (9) pass any bill of attainder or ex post facto law; or
 (10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.
 
 
 [5]
 We assume, for the moment, that the discrimination here in question is invidious
 
 
 [6]
 Hearings on Constitutional Rights of the American Indian Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 87th Cong., 1st Sess., pt. 1 (1962), 87th Cong., 1st Sess., pt. 2 (1963), 87th Cong., 2d Sess., pt. 3 (1963), and 88th Cong., 1st Sess., pt. 4 (1964)
 
 
 [7]
 Hearings on Constitutional Rights of the American Indian, S.961-68 & S.J.Res. 40, Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 89th Cong., 1st Sess. (1965)
 Congressional concern was not limited to extending constitutional protections to Indians in their relations with tribal government. It considered a broad range of measures: S.962, providing for federal court review of conviction by tribal courts where a constitutional deprivation is alleged; S.963, authorizing investigation by the Attorney General of all claims of deprivation of constitutional rights by Indians; S.964, directing the Secretary of the Interior to recommend to Congress a model code governing administration of criminal justice by courts of Indian offenses; S.965, conferring concurrent jurisdiction on the United States with the States over offenses committed by non-Indians against non-Indians on Indian lands; S.966, authorizing the States to assume civil and criminal jurisdiction over Indian territory with the consent of the Indians affected; S.967, certain amendments to the Major Crimes Act; S.968, expediting approval of certain tribal attorney contracts. The substance of these proposals, with two exceptions, were enacted into law. 114 Cong.Rec. 5835, 5992, 9621 (1968).
 
 
 [8]
 Hearings on Rights of Members of Indian Tribes Before the Subcomm. on Indian Affairs of the House Comm. on Interior & Insular Affairs, 90th Cong., 2d Sess. (1968)
 
 
 [9]
 The Committee report accompanying S.1843, S.Rep. No. 841, stated that:
 One of the most serious inadequacies in tribal government arises from its failure to conform to traditional constitutional safeguards which apply to State and Federal Governments. As Senator Anderson, a member of the Committee on Interior and Insular Affairs has noted: "An Indian citizen has all the rights of other citizens while he is off the reservation, but on the reservation, 'in the absence of federal legislation' he has only the rights given to him by the tribal governing body."
 Chairman Ervin has made a similar observation: "It appears that a tribe may deprive its members of property and liberty without due process of law and may not come under the limitation of federal and State governments as stated in the Bill of Rights. However, the sovereignty of an Indian tribe can be limited by acts of Congress."
 
 
 [10]
 The cases were Toledo v. Pueblo de Jemez, 119 F.Supp. 429 (D.N.M.1954) (reprisals against Protestants by Pueblo) and Native American Church v. Navajo Tribal Council, 272 F.2d 131 (10th Cir. 1959) (ban on peyote)
 
 
 [11]
 See Howlett v. The Salish and Kootenai Tribes, 529 F.2d 233 (9th Cir. 1976); Wounded Head v. Tribal Council of Oglala Sioux Tribe, 507 F.2d 1079 (8th Cir. 1975); McCurdy v. Steele, 506 F.2d 653 (10th Cir. 1974); Groundhog v. Keeler, 442 F.2d 674 (10th Cir. 1971). See also Note, The Indian Bill of Rights and the Constitutional Status of Tribal Governments, 82 Harv.L.Rev. 1343 (1969)
 
 
 [12]
 E. g., Wounded Head v. Tribal Council of Oglala Sioux Tribe, 507 F.2d 1079 (8th Cir. 1975) (rejecting challenge based in part on purported application of 26th Amendment)
 
 
 [13]
 E. g., Daly v. United States, 483 F.2d 700 (8th Cir. 1973); White Eagle v. One Feather, 478 F.2d 1311 (8th Cir. 1973) (requiring reapportionment)
 
 
 [14]
 E. g., Howlett v. The Salish and Kootenai Tribes, 529 F.2d 233 (9th Cir. 1976); Two Hawk v. Rosebud Sioux Tribe, 404 F.Supp. 1327 (D.S.D.1975) (upholding residency requirements)
 
 
 [15]
 E. g., Means v. Wilson, 522 F.2d 833 (8th Cir. 1975) (setting aside election)