**INDIAN POLITICAL ACTION COMMIT-
TEE et al., Plaintiffs,**

v.

**TRIBAL EXECUTIVE COMMITTEE OF
the MINNESOTA CHIPPEWA TRIBE
et al., Defendants.**

No. 6–74–Civ–223.

United States District Court,
D. Minnesota,
Sixth Division.

July 29, 1976.

William E. Mullin, Mullin, Weinberg & Daly, Minneapolis, Minn., and Charles W. LaDue, Bayer & LaDue, Coon Rapids, Minn., for plaintiffs.

Perry L. Williams, Williams, Halva & Sullivan, Columbia Heights, Minn., for defendant Jerome Buckanaga.

Kent P. Tupper, Tupper & Smith, Walker, Minn., and Bernard P. Becker, St. Paul, Minn., for defendant Tribal Executive Committee.

Robert G. Renner, U. S. Atty., Minneapolis, Minn., for amicus curiae U. S.

## MEMORANDUM AND ORDER

DEVITT, Chief Judge.

This action is a challenge to a series of elections held on the White Earth Indian Reservation of the Minnesota Chippewa Tribe for the office of Secretary-Treasurer of the Reservation Business Committee. The action originally involved a second election challenge and a claim of misuse of tribal funds. The second election controversy has become moot since plaintiff Wadena was finally certified as a winner and seated. Plaintiffs moved to continue trial regarding the allegation of fiscal irregularity since there is a pending investigation of these allegations by the Office of Revenue Sharing. This claim has not been pressed by plaintiffs or contravened by defendants. Since the matter is being investigated elsewhere, this court dismisses the claim without prejudice to the plaintiffs' right to reassert it in a subsequent lawsuit. Therefore, only the Secretary-Treasurer election challenge is presented for decision.

Plaintiffs in this action are John LaVoy, the ultimate unsuccessful candidate for Secretary-Treasurer; Frances Rock, Delores Rousu, and Geraldine Murray, residents of the White Earth Reservation, members of the Chippewa Tribe, and protesters of an election in issue; and the Indian Political Action Committee (IPAC), an unincorporated volunteer political group formed for the purpose of advocating various political reforms on the White Earth Reservation.

Defendants are the Tribal Executive Committee (TEC), governing body of the entire Minnesota Chippewa Tribe; the Reservation Business Committee (RBC), governing body of the White Earth Reservation; the General Election Board, a body appointed by the RBC to conduct the elections in issue; Charlotte Jackson, Frances Keahna and Pearl Clark, members of the General Election Board; and Jerome Buckanaga, incumbent Secretary-Treasurer of the RBC and opponent of LaVoy in the contested elections. The TEC and Jerome Buckanaga were the only defendants to answer the complaint, and the Clerk of Court entered the default of the remaining defendants on June 9, 1975.

The process of selecting the Secretary-Treasurer involved three elections held on June 11, 1974, August 1, 1974, and September 12, 1974, respectively. The first election resulted in a victory for LaVoy, and he was certified the winner by the General Election Board. However, the TEC voided this election after several protests were filed by tribal members and were heard by the TEC at a public meeting where all concerned were given the opportunity to speak. The controversy which infected the second election originated at the lower General Election Board level. The initial vote count indicated a LaVoy victory, but the Election Board subtracted 56 votes from his total due to irregularities concerning 56 absentee ballots. This subtraction resulted in the certification of Buckanaga as winner. LaVoy filed a protest with the TEC, and the General Election Board filed a counter-protest. Again, a public meeting was held, all concerned were heard, and the TEC ordered a new election. The final election resulted in a Buckanaga victory. A protest was filed to that election but was rejected on the grounds that no one appeared to testify or offer evidence in support of the protest.

The gravamen of plaintiffs' claim is that defendants denied them due process of law in the conduct of the elections and in consideration of their protests of the elections in contravention of the Fourteenth Amendment to the United States Constitution. Plaintiffs also allege that defendants conspired to deprive plaintiffs of equal protection of the law. The direct due process claim is brought pursuant to 25 U.S.C. §§ 1302, *et seq.*, popularly known as the Indian Bill of Rights Act. The conspiracy action is brought under 42 U.S.C. § 1985(3). Plaintiffs also move for a default judgment against all of the non-appearing defendants. This court previously declined to enjoin the third election on September 12, 1974. Discovery followed, and the matter proceeded to trial on May 20, 1976.

The recent case of *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975) operates to eliminate two of plaintiffs' claims. The conspiracy claim against the TEC, RBC, and General Election Board under 42 U.S.C. § 1985(3) is barred under the doctrine of tribal immunity. *Means v. Wilson, supra, Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe,* 370 F.2d 529 (8th Cir. 1967). The direct due process claim under 25 U.S.C. § 1302 against the individual defendants must be dismissed since the Indian Bill of Rights Act only provides rights against the tribe and its governmental subdivisions. Therefore, the only claims which are colorably before this court are the 25 U.S.C. § 1302 direct deprivation claim against the TEC, RBC, and General Election Board and the 42 U.S.C. § 1985(3) conspiracy claim against the individual defendants.

The conspiracy claim is open to further scrutiny. In the first place, plaintiffs pleaded only 25 U.S.C. § 1302 in support of the conspiracy claim. Under *Means v. Wilson, supra,* the conspiracy suit against the individual defendants would founder on the same shoals which caught the direct deprivation suit. The Indian Bill of Rights Act only protects individual rights vis-à-vis the tribe and its governmental subdivisions. However, this court is mindful of the mandate of Federal Rules of Civil Procedure 8 that technical niceties of pleading are not required. Two of the jurisdictional grounds invoked by plaintiffs were 42 U.S.C. §§ 1985(3) and 1986. Therefore, although

the conspiracy claim was not specifically pleaded under § 1985(3), this court will deal with the claim as if it had been so pleaded.

■ The elements of a § 1985(3) action were delineated in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). One of these requirements is a showing that there was a racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' action. Since this is an intratribal dispute between Indians, no racial animus could possibly have existed. In *Means v. Wilson, supra,* the court held that in a similar election contest, a class-based animus, sufficient to withstand a motion to dismiss, was demonstrated by the fact that plaintiffs were active supporters of a particular candidate and alleged that defendants conspired to deprive them of equal protection for that reason. Judge Webster pointed out in dissent that if taken to its logical extension, the court's holding would grant federal jurisdiction to any group of supporters of a candidate who claim they were purposefully victimized by their opponents in state or local elections. Even this broad reading of the opinion demands a showing that defendants acted in order to further their own cause and harm that of the plaintiff. The complaint only alleged that defendants had conspired to deprive LaVoy of his seat, thereby infringing upon the plaintiffs voting rights. There was no claim that the conspiracy was founded upon support of Buckanaga. No allegation or showing has been made that the individual defendants, with the exception of Buckanaga himself, were Buckanaga supporters. Therefore, the § 1985(3) claim against defendants Jackson, Clark and Keahna must be dismissed. Since this dismissal eliminates all remaining alleged co-conspirators, the claim against Buckanaga must also be dismissed. Furthermore, since the 42 U.S.C. § 1986 claim is derivative of the § 1985 claim, it too must be denied. *Tollett v. Laman,* 497 F.2d 1231 (8th Cir. 1974).

■ Since the TEC has appeared and the individual defendants have been dismissed, plaintiffs' motion for a default judgment is relevant only with regard to the 25 U.S.C. § 1302 claim against the RBC and the General Election Board. Default judgments are governed by Rule 55 of the Federal Rules of Civil Procedure. It is well settled that entry of a default judgment is addressed to the sound discretion of the court. *National Bank of Arkansas v. General Mills, Inc.,* 283 F.2d 574 (8th Cir. 1960). Plaintiff has admitted that the TEC is the body ultimately responsible for the conduct of reservation elections (Plaintiff's response to motion to dismiss, p. 6). Article IV. Section 1 of the Tribal Constitution mandates that all RBC elections are to be held under a general ordinance adopted by the TEC. Under that ordinance, the TEC hears all election protests and decides their merit. The General Election Board only administers the election and certifies the result. The Board's acts are reviewable by the TEC under the protest procedure. The RBC's sole participation is through appointment of the Election Board. Therefore, it is clear that the only body which can grant plaintiffs their requested relief is the TEC. A default judgment against the inferior political bodies would bring about the anomalous result of ordering them, without a trial on the merits, to do that which they cannot do—seat LaVoy as Secretary-Treasurer of the RBC while mooting the case to the party which can take such action, the TEC. With regard to plaintiffs' claim for damages, a judgment against the inferior bodies would ultimately have to be paid by the TEC. In short, plaintiffs' quarrel is with the TEC, not the RBC or the General Election Board. Therefore, this court declines to enter a default judgment against them.

Now to the merits of the case. Plaintiffs' due process claim is two-fold. They complain that the procedures employed by the TEC, basically the type of protest hearing offered, and the ultimate decision of the TEC in light of the evidence proffered were violative of due process. *Means v. Wilson, supra,* at 842, outlined the court's approach when official tribal action is challenged on constitutional grounds:

Additional considerations of the desirability of preservation of unique tribal cul-

tures and continued vitality of tribal governments underlie the Indian Civil Rights Act, however, and these considerations counsel great caution in applying traditional constitutional principles to Indian Tribal governments. *O'Neal v. Cheyenne River Sioux Tribe*, 482 F.2d 1140, 1144 (8th Cir. 1973).

In *Means v. Wilson*, the alleged interference with voting rights included claims of physical intimidation, deliberately improper instructions to election judges, etc. The court held that traditional constitutional concepts could apply to these claims since the alleged acts of interference had nothing to do with tribal custom. In the present litigation, plaintiffs' claims concerning the hearing procedures cannot be measured by normal due process standards including formal testimony, cross-examination, a written record, and written reasons for decision. The "town meeting" type hearing which was employed by the TEC is the traditional form of tribal hearing and must be measured by the general standard of fundamental fairness. The ultimate decision by the TEC, unrelated as it was to traditional tribal custom, must be reviewed in the usual manner—to determine if the decision had a rational basis.

All of the protests in all of the elections in issue were heard by the TEC at an open meeting. All who cared to present evidence or argument were allowed to do so. No formal subpoenas or invitations to testify were issued, but all tribe members had notice of the meeting and were given the opportunity to speak. The General Election Board was required to present evidence regarding the charges stated in the protests and to answer any questions propounded by the audience. In the protest hearing regarding the second election, the plaintiff protesters were represented by their attorney. The transcript of the protest hearing of July 3, 1974 shows that the election protests for the White Earth Reservation were heard under the same rules as

protests filed on other Minnesota Chippewa reservations.[1] This court refuses to hold that this time-honored and customary procedure employed by the TEC is so lacking in fundamental fairness as to constitute a denial of due process. All members of the tribe had notice of the meeting, and all who came were given the opportunity to be heard. No fairer procedure could exist.

Plaintiffs admit that this court's task in reviewing the decisions of the TEC is to determine if those decisions were rational. The first decision in issue is the refusal of the TEC to seat plaintiff LaVoy after the General Election Board had certified his victory in the first election. Three protests were filed. Two of the protests took issue with a total of four votes. The third protest was supported by an affidavit signed by 125 persons which asserted that there were irregularities in the handling of absentee ballots. All three protesters presented their cases, and the General Election Board was called upon to answer their charges. Other audience members were given the opportunity to speak. Plaintiffs claim that the TEC's decision ordering a new election was irrational since the affidavit presented only made general allegations of irregularity, did not identify the 125 signers as voters, and did not contain evidence or assertions that any specific votes were affected by the irregularities. Plaintiffs' position seems to be that in order for the TEC to rationally order a new election, a sufficient number of votes to change the outcome must be specifically challenged. This is not the case. As long as the claim of election taint is rationally related to the election process, then the TEC has the discretion to order a new election. Situations could arise where it would be impossible to connect the infecting act to a specific vote. For example, if a vigilante group were terrorizing the reservation during the time of an election, the TEC could rationally decide to order a new election even though the general fearful atmosphere could not be

---

1. Plaintiffs objected to the entry of this portion of the transcript in evidence on the grounds of relevancy. This objection is overruled. The material regarding protests of other reservation elections is relevant to show the uniform application of this customary hearing procedure.

specifically linked to the casting of a single vote. In the case at bar, there is ample evidence to support the rationality of the TEC's unanimous decision. Therefore, that decision must stand.

Plaintiffs challenge the decision rendered with regard to the second election at two levels. First, they attack the decision of the General Election Board to subtract 56 absentee votes from LaVoy's total on the grounds of improper notarization of the absentee ballots. The circumstances surrounding this action are extremely cloudy, and there is no written record to elucidate matters. It is clear that even the members of the Board were confused as to the action they had taken. However, plaintiffs filed a protest through the proper channels. In addition, the Board filed a counter-protest in order to clear up the confusion. It is not the job of this court to review the Board's decision and determine its rationality. A de novo review was made by the TEC. The court's job is to examine the evidence presented to the TEC and decide if its decision was rationally reached.

The TEC was presented with the Board's certification of a Buckanaga victory, the absentee ballot requests in issue, and testimony from the protesters and the Board members. Again, plaintiffs advance the theory that a new election can be rationally ordered only if specific challenges to a number of votes sufficient to alter the outcome are presented. Once again, plaintiffs miss the point. This court cannot substitute its judgment for that of the TEC. It can only determine whether or not the TEC's decision had a rational basis. Plaintiffs would have a colorable argument if the TEC had not overturned the election but had approved the certification of Buckanaga. This could only have been done if the subtraction of the 56 votes from LaVoy's total had been allowed to stand. The rationality of such a decision would be questionable. However, the TEC, realizing that once again the election had been tainted by various irregularities, partially granted the plaintiffs' protest by refusing to seat Buckanaga. It simply refused to go the fur-ther step of ignoring the irregularities and seating LaVoy. Therefore, the decision to order a new election was eminently rational and this court will not upset it.

THEREFORE, IT IS ORDERED:

1. The action regarding misuse of tribal funds is dismissed.

2. The action against all defendants under 42 U.S.C. § 1985(3) is dismissed.

3. The action against the individual defendants under 25 U.S.C. § 1302 *et seq.* is dismissed.

4. Plaintiffs' motion for a default judgment against the RBC and General Election Board is denied.

5. Judgment for the TEC on the merits is granted and the memorandum above shall constitute the court's findings of fact and conclusions of law.