Pat STANDS OVER BULL, Plaintiff,

v.

BUREAU OF INDIAN AFFAIRS, and its Area Director, James Canan, the Crow Tribe of Indians of Montana, the Crow Indian Tribal Council, and Forrest Horn, acting Chairman of the Crow Tribal Council, Defendants.

No. CV–77–98–BLG.

United States District Court, D. Montana, Billings Division.

Dec. 6, 1977.

Robert L. Stephens, Jr., Billings, Mont., for plaintiff.

Robert L. Zimmerman, Asst. U. S. Atty., Billings, Mont., for federal defendants.

Thomas J. Lynaugh and Thomas K. Schoppert, Lynaugh, Fitzgerald, Schoppert, Skaggs & Essman, Billings, Mont., for Crow Tribe of Indians, and other Indian defendants.

## MEMORANDUM AND ORDER

BATTIN, District Judge.

Pat Stands Over Bull was removed as Tribal Chairman of the Crow Tribal Council at a regular meeting[1] which convened at Crow Agency, Montana, on July 9, 1977. Stands Over Bull, as an enrolled member of the Crow Tribe of Indians, was duly elected as chairman of the Crow Tribal Council for a term of two years, commencing on July 1, 1976. Following his removal, the plaintiff, Pat Stands Over Bull, filed this complaint on July 28, 1977. He seeks to invoke the equitable powers of this Court in order to gain his reinstatement, with back pay, as Tribal Chairman.

The defendant Indian Tribe and the defendant Crow Tribal Council and the Acting Chairman, have filed consolidated motions to dismiss. The federal defendants, the Bureau of Indian Affairs and its Area Director, James Canan, have filed a separate motion to dismiss. Additionally, the plaintiff has filed a motion to strike the affidavit of Bud Fritzler and certain exhibits attached thereto. All the motions have been briefed and have been submitted to the Court for decision. I find that the motion of the federal defendants to dismiss for want of subject matter jurisdiction should be granted and that the motion to strike and the motion for a judgment on the pleadings should be denied. I further find that the motion to dismiss of the Crow tribal defendants should be treated as a motion for summary judgment, the Court having considered matters outside the pleadings, and as such it should be granted. Rule 12(b) and Rule 56, F.R.Civ.P.

## I. THE COMPLAINT

This is an action seeking a permanent injunction and a declaratory judgment. The plaintiff alleges that jurisdiction rests with this Court by virtue of 28 U.S.C. § 1343(4)[2] in that the suit is one to secure equitable and other relief under an Act of Congress providing for the protection of civil rights. The plaintiff claims that the rights he seeks to redress are rights guaranteed to him by the Indian Civil Rights Act of 1968, 25 U.S.C. § 1302(8),[3] and the Fourteenth Amendment to the United States Constitution.

1. Article VI (Res. 62–11) of the Constitution of the Crow Tribe (as amended) requires regular tribal council meetings to be called by the chairman and committee on the second Saturday of, respectively, January, April, July and October of each year. Notices of all council meetings are required to be given at least seven (7) days prior to each meeting date.

2. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote. . . ."

3. "No Indian tribe in exercising powers of self-government shall—

"(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law; . . . ."

The essence of plaintiff's complaint is that he was denied due process of law when he was removed as Tribal Chairman of the Crow Tribe of Indians. The allegations of the complaint may be summarized as follows:

1. The resolution calling for the plaintiff's impeachment, together with the thirteen articles of impeachment, operated to deny the plaintiff his "fundamental rights" under the Indian Civil Rights Act and the Fourteenth Amendment because:

    a. The articles of impeachment failed to provide for the introduction of any sworn testimony or other legal or lawful evidence upon which an impeachment proceeding could be based;

    b. The articles failed to allege any cause or grounds recognized under the Constitution or By-laws of the Crow Tribe, specifically Article V,[4] for the removal of tribal officers;

    c. The impeachment resolution purports to amend the Tribal By-laws and Constitution contrary to the requirements of Resolution No. 62–11[5] by the inclusion and adoption of Paragraph XI[6] of the impeachment resolution, the savings clause of that resolution.

2. The impeachment procedures were "unconstitutional" and violated the due process clause of the Indian Civil Rights Act by denying the plaintiff:

    a. The right to proper and adequate notice of the allegations in the impeachment resolution;

    b. The right to a reasonable time within which to respond to the allegations brought against him;

    c. The right to prepare a defense and to obtain the effective assistance of counsel;

    d. The right to be free of the "Kangaroo-Court" atmosphere within which the proceedings transpired.

3. The procedure which was followed during the course of the proceedings deprived the plaintiff of the opportunity to confront and cross-examine his accusers and further prevented the plaintiff from presenting any legal evidence or sworn testimony from non-members of the Crow Tribe of Indians;

4. The plaintiff was not afforded an impartial tribunal to hear evidence and rule on procedural questions as required by the Indian Civil Rights Act;

5. The controversy involved here is a political controversy concerning the impact of coal development on the Crow Tribe of Indians and does not relate to any wrongdoing or unlawful conduct allegedly perpetrated by the Chairman;

6. The impeachment of the plaintiff has thrown the Tribal government into a state of chaos and confusion, placing the self-determination and future of the Crow Tribe in jeopardy; and

7. The Bureau of Indian Affairs and its agents have wrongfully recognized the defendant Forrest Horn as Chairman of the Crow Tribal Council.

It is against these claims that any rights the plaintiff possesses must be measured.

## II. JURISDICTION

### A. *Fourteenth Amendment Clause*

■ This Court may not entertain claims made by an Indian person against an Indian tribal government when such claims are predicated on rights allegedly secured to the individual tribal member under the

---

**4.** Article V: "The Crow Tribe, through its tribal council, reserves unto itself the right to remove for cause any officer of the council for misconduct or negligence or non-diligence in connection with the protection of the rights of the Crow Tribe in its relations with the Bureau of Indian Affairs or the local employees."

**5.** Res. No. 62–11: "This Constitution and By-laws shall be amended by a majority vote at an election called for that purpose by the Tribal Council, provided no amendment shall become effective until it shall have been approved by the Commissioner of Indian Affairs or his authorized representative."

**6.** The complaint mistakenly refers to Paragraph XII vice Paragraph XI of the impeachment resolution. There was no Paragraph XII contained in the impeachment resolution.

Fourteenth Amendment.[7] It is axiomatic that

> "In the Indian relationship with the tribe the Fourteenth Amendment provides no rights. It is directed at the states and an Indian tribe is not a state." *Spotted Eagle v. Blackfeet Tribe of Blackfeet Indian Reservation*, 301 F.Supp. 85, 88 (D.Mont. 1969).

The doctrine of internal controversies still operates to deprive federal courts of subject matter jurisdiction except in those areas specifically provided for in the Indian Civil Rights Act. *Jacobson v. Forest County Potawatomi Community, et al.*, 389 F.Supp. 994, 995 (E.D.Wis.1974). The motions of the tribal defendants to dismiss are well taken with respect to the claims which are premised on the Fourteenth Amendment set forth in Counts VIII, IX, X, XII, and XV of the complaint.

### B. *Claims Against the Federal Defendants.*

Neither does the Court have jurisdiction to entertain the claims made here against the federal defendants. It is well settled that the United States may not be sued without its consent. *See, e. g., Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

Stating a cause of action under 25 U.S.C. § 1302(8) permits the invocation of federal jurisdiction under the provisions of 28 U.S.C. § 1343(4), regardless of the amount in controversy. *Spotted Eagle v. Blackfeet Tribe, supra* at 89. However, § 1302(8) does not permit claims against Federal defendants and confers no rights on tribal members against the United States. Instead, it applies only to self-governing Indian tribes. *Cf. Jacobson v. Forest County Potawatomi Community, supra* at 995. As the District Court in *Jacobson, supra,* noted:

> "With respect to the federal defendants, there exists no statutory authority for this court to exercise judicial control in this matter. The principle that the United States, as sovereign, is immune from suit save as it consents to be sued, is not affected by the fact that the government has voluntarily undertaken a trustee relationship with respect to Indians. [Citations omitted.] Facts have not been alleged which, if proved, would show that the federal defendants have acted *ultra vires* or unconstitutionally." *Jacobson v. Forest County Potawatomi Community, supra* at 996.

There is no allegation that the federal officials named in this suit participated in any way in the removal proceedings against this plaintiff. As such, they cannot be sued by virtue of the protections afforded the plaintiff under § 1302(8). *Dry Creek Lodge v. United States*, 515 F.2d 926 (10th Cir. 1975). There is insufficient federal involvement extant here to find that the United States has waived sovereign immunity. *See, Yellowtail v. Pat Stands Over Bull*, CV–76–93– BLG (D.Mont.1977). There is no subject matter jurisdiction in this Court over the Bureau of Indian Affairs or James Canan, its Area Director. The federal defendants' motion to dismiss should thus be granted.

### C. *Jurisdiction Over the Tribal Defendants.*

Title 28 U.S.C. § 1343(4) [8] grants original jurisdiction to the federal district courts in civil rights actions wherein the plaintiff seeks equitable or monetary relief. *Spotted Eagle v. Blackfeet Tribe, supra* at 89. The Ninth Circuit has determined

> ". . . that the Indian Civil Rights Act provides a jurisdictional basis for the federal district court because the Act evidences a Congressional exception to the general policy of immunity of Indian tribes from suit." *Johnson v. Lower Elwha Tribal Community*, 484 F.2d 200, 202 (9th Cir. 1973).

---

**7.** Indeed, the very purpose of the Indian Civil Rights Act was to give Indians the same rights other Americans enjoy. *See* Senator Ervin's remarks concerning the Act in 1968 U.S.Code Cong. & Admin.News, pp. 1863–67.

**8.** The text of 28 U.S.C. § 1343(4) is set forth in n.2, *supra.*

■ The rationale of the cases reveals that the Indian Civil Rights Act creates a substantive body of rights, patterned in part on the Bill of Rights, to protect the individual Indian from the excesses of tribal authority.[9] *Johnson v. Lower Elwha Tribal Community, supra* at 203. At the same time, however, it must be remembered that the Indian Civil Rights Act is not coextensive with the Bill of Rights or the Fourteenth Amendment. *See, e. g., Howlett v. Salish and Kootenai Tribes of the Flathead Reservation,* 529 F.2d 233, 237 (9th Cir. 1976); *Wounded Head v. Tribal Council of the Oglala Sioux Tribe,* 507 F.2d 1079, 1082 (8th Cir. 1975); *Spotted Eagle v. Blackfeet Tribe, supra* at 88. Suits under the Indian Civil Rights Act are not barred by sovereign immunity[10] since there is an implicit Congressional consent to suit. *Johnson v. Lower Elwha Tribal Community, supra* at 202.

■ The Court concludes that subject matter jurisdiction in this case exists only with respect to the tribal defendants. Any rights Pat Stands Over Bull has against the Crow Tribe are only those rights granted by the Indian Civil Rights Act of 1968.[11]

## III. PROCEDURE

### A. *Judgment on the Pleadings.*

■ The Crow Tribe and Forrest Horn have moved for a judgment on the pleadings pursuant to Rule 12(c) of the F.R. Civ.P. That rule provides:

"*After the pleadings are closed* but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." Rule 12(c), F.R.Civ.P. (emphasis added).

The only defendants answering thus far in this case are the federal defendants. The Crow tribal defendants, who have moved pursuant to Rule 12(c) have yet to answer. Thus, the pleadings are not closed.[12] When a defendant has failed to file an answer, a motion for judgment on the pleadings is not the correct procedural remedy. *General Motors Corp. v. Blevins,* 144 F.Supp. 381 (D.Colo.1956). Judgment on the pleadings under Rule 12(c) is available only when the pleadings are closed. *City Bank v. Glenn Construction Corporation,* 68 F.R.D. 511, 512 (D. Hawaii 1975). As such, the Rule 12(c) motion in this case must be denied.

### B. *Plaintiff's Motion to Strike.*

■ The plaintiff has moved to strike the affidavit of Bud Fritzler and the exhibits attached to it. The defendants argue that the motion to strike is untimely[13] and ill-taken. The material in the Fritzler affidavit and attached exhibits answers a major contention urged in the plaintiff's complaint. That is, that his notice of the July impeachment proceedings and the opportunity he was given to prepare his defense were inadequate.

Rule 12(f) provides:

9. See, also, *Howlett v. Salish and Kootenai Tribes,* 529 F.2d 233 (9th Cir. 1976); *Crowe v. Eastern Bank,* 506 F.2d 1231 (4th Cir. 1974); *Luxon v. Rosebud Tribe,* 455 F.2d 698 (8th Cir. 1972). But *see, Slattery v. Arapahoe Tribal Council,* 453 F.2d 278 (10th Cir. 1971).

10. Indian Tribes are quasi-sovereign and enjoy immunity from suit coextensive with that of the United States except where there has been a Congressional consent to suit. *Hamilton v. Nakai,* 453 F.2d 152, 158 (9th Cir. 1971), cert. denied 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972).

11. 25 U.S.C. §§ 1301, 1302, 1303.

12. *See,* Rule 7(a), F.R.Civ.P.; 2A *Moore's Federal Practice,* ¶ 7.02, p. 1531; 2A *Moore's Federal Practice,* ¶ 12.15, p. 2342.

13. Pursuant to a request of plaintiff's counsel, a conference in this case was held in Chambers wherein counsel for all the parties were present. The conference was prior to the filing of the motion to strike and the parties agreed that the case could be deemed submitted with respect to the tribal defendants. Counsel for the plaintiff asked the Court's indulgence only with respect to filing a responsive brief to the federal defendants' motion to dismiss.

"Upon motion made by a party before responding to a pleading . . . or upon the court's own initiative at any time, the court may order stricken from *any pleading* any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." F.R.Civ.P. 12(f) (emphasis added).

Rule 12(f) reflects the inherent power of the Court to prune down pleadings so as to expedite the administration of justice and to prevent abuse of its process. 2A Moore's Federal Practice, ¶ 12.21, p. 2419. The rule itself is a carryover from Code pleading, specifically Equity Rule 21.

"It is recognized that motions to strike are not favored and should not be granted unless it is clear that the matters stricken have no possible relationship to the controversy and may prejudice the other party." *Sun Insurance Company of New York v. Diversified Engineers, Inc.*, 240 F.Supp. 606, 612 (D.Mont.1965).

In addition to the general disfavor [14] with which motions to strike are construed, there is a further limitation which must be considered here. That is, the rule is limited in its application to "pleadings". Rule 12(f), F.R.Civ.P. "Pleadings" within the meaning of the Federal Rules of Civil Procedure are those matters set forth in Rule 7(a). The plaintiff in this instance seeks to strike an affidavit and therefore invokes a procedure not within the literal meaning of the Rules.

▌ The motion to strike has been used as a device to strike affidavits when a court has rationalized that the Federal Rules provide no other technique for challenging affidavits, *Monroe v. Board of Education of Town of Walcott, Conn.*, 65 F.R.D. 641, 647 (D.Conn.1975). However, the better reasoned rule, and that adopted here, is set forth in *Wimberly v. Clark Controller Company*, 364 F.2d 225 (6th Cir. 1966). There the Court considered the propriety of a motion to strike affidavits filed with a motion to dismiss pursuant to Rule 12(b). The Court found that Rule 12(f) relates to matters to be stricken from the pleadings and with respect to the affidavits sought to be stricken,

"[a]t best, the motion to strike raised an issue as to the admissibility of the evidence offered in the affidavit, and the competency of the affiant to testify to the matters stated therein." *Wimberly v. Clark Controller Company*, supra at 227.

When the Fritzler affidavit is examined in light of the *Wimberly* proposition, it is appropriate to deny the motion to strike. This is especially so when considered in light of the general disfavor accompanying motions to strike. *Sun Insurance Co. v. Diversified Engineers, supra* at 612.

C. *Summary Judgment.*

▌ A motion to dismiss for failure to state a claim upon which relief can be granted may be treated as one for summary judgment and disposed of as provided in Rule 56. F.R.Civ.P. 12(b); *Faulkner v. Federation of Preschool and Community Education Centers, Inc.*, 564 F.2d 327, 328 (9th Cir., 1977). The Court has considered a plethora of materials outside the pleadings in disposing of the tribal defendants' motion to dismiss. As such, the motion is considered as though made pursuant to Rule 56. Rule 12(b), F.R.Civ.P. It is subject to the limitations of that rule. The question presented by a motion for summary judgment is one of law and if a genuine issue of material facts exists, the motion must be denied.[15] 6 *Moore's Federal Practice*, ¶ 56.01, *et seq.*, p. 56–1. The party moving for summary judgment has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to judgment in his favor. 6 *Moore's Federal Practice*, Pt. 2, ¶ 56.15[4], p. 56–511.

It is necessary to here consider the propriety of entertaining a review of the Min-

---

14. See, 2A *Moore's Federal Practice*, ¶ 12.21[2], p. 2429.

15. *See, e. g., Lane Bryant v. Maternity Lane, Ltd. of California*, 173 F.2d 559, 565 (9th Cir. 1949).

utes[16] of the July 9, 1977, Crow Tribal Council meeting in deciding the motion for summary judgment.

A motion for summary judgment is to be decided on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . ." F.R.Civ.P. 56(c). It is obvious that the Minutes of the July 9, 1977, Crow Tribal Council meeting do not fall into any of these categories. However, the scope of materials that have been allowed to be considered is actually somewhat broader than the listing in Rule 56(c). *Monroe v. Board of Education, supra* at 645. The record of an administrative proceeding may properly be considered in determining summary judgment. 6 *Moore's Federal Practice*, ¶ 56.11[1.–8], at p. 56–204 n. 4.

■ Even though the record of the proceedings involving the removal of Stands Over Bull from office is not an administrative record in the usual sense of the term, it is verified[17] so the Court may consider it as material that would be admissible or otherwise usable at trial. *Cf. In re Diamond Door Co.*, 505 F.2d 1199 (9th Cir. 1974); *see, also*, 6 *Moore's Federal Practice*, ¶ 56.11[1.–8], p. 56–206.

With this determination, it is necessary to consider the Crow tribal defendants' motion to dismiss, which is treated as a motion for summary judgment. F.R.Civ.P. 12(b), 56.

## IV. FACTS

### A. *Impeachment.*

At the outset it must be noted that under Articles I[18] and III[19] of the Constitution of the Crow Tribe, the Crow Tribal Council consists of the entire adult membership of the Crow Tribe of Indians. Females eighteen years of age and older, and males twenty-one years of age and older, are entitled to participate in the deliberations and voting of the Council. Thus, the legislative body of the Tribe is the entire adult membership of the Tribe. *See, Lefthand v. Crow Tribal Council of Crow Tribe*, 329 F.Supp. 728 (D.Mont.1971). The Tribal Constitution provides that the Council shall establish its own rules of procedure.[20] With minor exceptions, the decisions of the Council are made by a simple majority of the votes cast.[21] The Council of the Crow Tribe is the voice of the Crow Tribe and the medium through which the Crow Tribe speaks.[22] In addition to the Tribal Council, the Constitution of the Crow Tribe also establishes a committee composed of two members from each of the six districts of the Crow Reservation and two members from off-the-reservation Indians elected for a term of two years, with the committee to act as an executive committee in working with the officers under the general direction of the Council.[23]

On June 29, 1977, a resolution regarding the impeachment of the Chairman of the

---

16. There are two sets of "minutes" of the July 9, 1977, Council meeting. Ada White prepared a verbatim transcription of the entire proceedings of the July 9, 1977, quarterly meeting. The minutes prepared by White are referred to as the Knows The Gun Minutes. The other minutes, attached as "Exhibit B" to the complaint, are the White Clay Minutes, prepared at the direction of Philip White Clay, the Tribal Secretary. Having considered both sets of minutes, the Court finds that there are no material differences in them. The Knows The Gun Minutes are more complete and are verified by affidavit of the person who transcribed them. Verification is important not so much as for the accuracy of the documents themselves, but as far as the propriety of considering them in conjunction with the motion for summary judgment.

17. *Monroe v. Board of Education*, 65 F.R.D. 641 (D.Conn.1975), can be distinguished from the present case in that the record of the Crow proceedings is verified.

18. "The Crow Tribal Council shall be composed of the entire membership of the Crow Tribe."

19. "Any duly enrolled member of the Crow Tribe, except as herein provided, shall be entitled to engage in the deliberations and voting of the Council, provided the females are 18 years old and the males are 21 years."

20. Crow Tribal Constitution, Article VI, § 1.

21. Article VI, § 6, Crow Tribal Constitution.

22. Article VII, §§ 1 and 2.

23. Article VI, § 9.

Crow Tribal Council, Patrick Stands Over Bull, was presented to the executive committee, together with a procedure for the impeachment and a document known as the Articles of Impeachment. The documents were accompanied by a petition signed by over 100 enrolled tribal members of legal age.[24] After deliberating, the executive committee voted 10 to 4 to accept the resolution and the accompanying documents. Patrick Stands Over Bull was present at the June 29th meeting when the resolution was discussed, and he was given a copy of the resolution and the accompanying documents.[25] The resolution in June of 1977 was not the first attempt to impeach Patrick Stands Over Bull.[26] However, as a result of the Executive Committee meeting in June where Stands Over Bull's antagonists were successful in getting the impeachment resolution on the Tribal Agenda for the July quarterly meeting, the plaintiff commenced the preparation of his defense. Traditionally, the members of the Crow Tribal Council have informed themselves of issues to be presented at the quarterly meetings by having various feasts, district meetings, and informal gatherings during the week prior to the Council meeting. The uncontradicted affidavit of Bud Fritzler indicates that at those traditional meetings Patrick Stands Over Bull informed some Crow tribal members of the impeachment resolution and his defenses to the resolution. It was also uncontradicted that the plaintiff specifically prepared the response to the charges against him in the impeachment resolution and distributed his position to the various gatherings of the tribal members during the week of July 4, 1977. The plaintiff's position with regard to the impeachment allegations was published in the area newspaper on July 8, 1977.[27]

At the July 9, 1977, council meeting, there were two votes taken with respect to impeachment of Stands Over Bull. The first vote, which was to accept the impeachment procedures and to adopt the proposed articles of impeachment, passed by a vote of 644 to 612. Thereafter, every interested member of the Tribal Council who so desired was given an opportunity to speak out against the chairman and in favor of his impeachment. Most of the colloquy was in the native Crow language. A time limitation of five minutes was placed on each of the proponents. At the conclusion of each of the statements against the chairman, the chairman was given an opportunity to ask questions and to counter the statements made against him. Twelve speakers spoke out against the chairman; however, Stands Over Bull elected not to question any of the proponents of the impeachment resolution.

Subsequently, every interested tribal member who so desired was given an oppor-

---

24. Article VI of the Crow Tribal Constitution, § 4, provides that the "Agenda of the Tribal Council meeting shall include all items required by the (1) tribal chairman and committee, (2) superintendent of the Crow Agency, and (3) a petition duly signed by 100 qualified voters."

25. See Affidavit of Ada White [Document No. 9, Court Record.]

26. The issues raised in the previous attempts to suspend or impeach the plaintiff are relative to the present action only with respect to the plaintiff's claim of inadequate notice of the charges brought against him.

On December 13, 1976, Bud Fritzler presented a petition containing over 100 signatures of enrolled tribal members of voting age, to the Executive Committee of the Tribe. The petition asked to suspend Patrick Stands Over Bull as chairman of the Crow Tribe because of certain alleged activities of Pat Stands Over Bull. The committee did not accept the petition; however, the petition was presented to a special Tribal Council meeting on December 22, 1976, but that meeting was adjourned before the resolution was brought to the floor.

In January of 1977, another resolution was presented to the quarterly council meeting held on January 8, 1977. The resolution sought to suspend Patrick Stands Over Bull. A voice vote was taken on the issue of suspension and after the vote was in, the chairman, Patrick Stands Over Bull, declared that the suspension resolution had been defeated. A third petition, with the requisite number of names, was presented to the Executive Committee on March 31, 1977; this petition asked for the removal of Patrick Stands Over Bull. The petition was not placed on the Tribal Agenda because of a ruling that the petition was not in the proper form.

27. BILLINGS GAZETTE, July 8, 1977, at 1, col. 1.

tunity to speak in favor of the chairman. Twenty-two members of the council spoke on behalf of Stands Over Bull. As with the proponents of impeachment, each of the opponents was limited to a five-minute time frame within which to speak. One of the speakers who spoke on behalf of Stands Over Bull, although prior to the actual consideration of the impeachment resolutions, was his attorney, Larry Yonkee. At the conclusion of the statements on behalf of Stands Over Bull, the chair offered the plaintiff "all the time in the world" to speak on his own behalf.[28] The plaintiff declined the invitation, but before a vote on the impeachment resolutions was taken, he made a statement:

"Thank you, Alex. You done a good job. You people, the Crows, as for my part, my personal attorney has left. I believe every people in favor of impeachment, speak in favor of the impeachment come forward. Being against it, I appreciate those that support me. I want to thank them tonight. *As for my defense, I will not make any comments. Because I don't realize this kind of kangaroo hearing, null and void. I hereby as Chairman of the Crow Tribe declare it null and void. My answers will come in proper authorities.* That's all I have to say. I will continue to act as your Chairman, if I am impeached I will still continue until I go through the proper channel. I believe we are not done yet, (have them vote)."[29] (Emphasis added.)

The vote was taken and 622 members of the Tribal Council voted to impeach Stands Over Bull, 454 voted against it. Stands Over Bull conceded to the resolution for the remainder of the July quarterly meeting but reiterated that he had not given up the chairmanship and indicated he would challenge it.[30] Following the July quarterly meeting, the plaintiff contacted the Superintendent of the Crow Agency and the Area Director of the Bureau of Indian Affairs regarding an administrative appeal.[31] The administrative decision was that the impeachment was not a problem for the Bureau but that it should be settled by the Courts. The Bureau Area Director indicated that unless otherwise ordered by a federal court the Superintendent was authorized to recognize the signature of Forrest Horn, the Vice Chairman, as the Chairman of the Tribe in matters coming before the Bureau for official action.

I find this case is appropriate for determination on summary judgment because there are no issues of material fact. Rule 56, F.R.Civ.P.

### B. *Crow Historical Background.*

The impeachment of Patrick Stands Over Bull is an issue which has some precedent in the history of the Crow Tribe. The underlying issue in the present impeachment is characterized in the complaint as being a "political controversy" deriving its importance from the impact of coal development on the Crow Tribe of Indians. To understand this controversy, it is necessary to consider a brief historical sketch of the Crow Tribe.

The vast stretch of land that existed between the Black Hills of South Dakota, the Rocky Mountains of Montana and Wyoming, and the land between the North Platte River in Wyoming and the Milk River in northern Montana, was regarded by the Crow as their hunting territory.[32] It was in this area that the Crows hunted the bison and waged war with their enemies. The Crow, although a small tribe, were one of the strongest military powers on the plains.

---

28. Knows The Gun Minutes, page 28 [Document No. 9, Court Record].

29. Knows The Gun Minutes, page 28 [Document No. 9, Court Record].

30. Id. at 29.

31. See Exhibits "C" and "D" attached to the complaint. The Court finds the exhaustion requirement has been met in this case, *Howlett v.*

*Salish and Kootenai Tribes,* 529 F.2d 233, 240 (9th Cir. 1976).

32. This information is taken from a book entitled "The Crow People" by Dale K. McGinnis and Floyd W. Sharrock, published by the Indian Tribal Series/Phoenix.

The Crow were constantly in conflict with the Blackfeet who were situated to the north and west and with the Shoshoni and Arapahoe who claimed the area to the south. To the west a conflict with the Nez Perce existed and a conflict over the lands to the east of the Crow existed with the Cheyenne and the Sioux. The ultimate result of the costly conflicts with the various tribes divided the Crow into two groups, the River Crow and the Mountain Crow. This early division is perhaps the historical basis for the factional split that exists even to the present day within the tribe. Although the two bands were separate and politically distinct, they considered themselves as one people and referred to themselves as "Bi'ruke", meaning "we".

Before the Government's act in placing the Crow on a reservation, there was no permanent, administrative law-enforcement body for the tribe. The River Crow and the Mountain Crow each had one head chief and a council of sub-chiefs. The Crow Nation, on the other hand, did not have a head chief. But as a rule, there was one chief from among all those in the subdivisions who was better known and more respected than the other chiefs.

The attainment of the status of a chief depended on an accumulation of the four war deeds. Any of the Crow braves who accomplished the deeds was sure to become a chief. The main function of the council of chiefs was to administer the movements of the tribe and to act in an advisory capacity to hunting and war parties.

Most importantly, as a rule, a camp chief remained in office only as long as the tribe enjoyed good fortune. When, and if, any misfortune struck, it usually resulted in the recognition of a new chief.[33]

"The deterioration and eventual loss of the qualifications would end a chief's reign, and the successor assumed leadership without fanfare or controversy. When people no longer listened to the chief's advice and no longer displayed their respect, and the council's chieftains ignored him, the chief would retire gracefully by not inviting the council chieftains to come to his lodge 'to smoke and talk'." [34]

For a period of about 25 years from 1880 to 1905, the government, in pursuing land acquisition plans with the Crows, unwittingly initiated and encouraged the Crows to develop the council method of dealing with the Great White Father.[35] The battle over the Crow lands and the fate of the Crow Tribe fell into the hands of the aging Crow chiefs. The chiefs realized that they had to reorganize and augment their forces. They enlisted the talents of young Crows returning as graduates from the Carlisle, Haskell and Sherman Institutes and other off-reservation federal Indian schools.

Beginning in 1906, the chiefs and their educated young cohorts vigilantly watched the actions of Congress. Any time a hearing on a bill to open the reservation was presented, a contingent from the Tribe would go to Washington, D. C. However, in the meantime, the chiefs called council meetings at home in order to plan their defenses and to attend to other reservation matters. Through the council system, the tribal leaders were able to exert some measure of influence in such matters as leasing large tracts of grazing areas to non-Indian livestock operators and constructing irrigation systems.[36] The Crows were able to acquire some measure of self-determination, at least politically, by dealing directly with the Members of Congress and with other officials in Washington. "The old

**33.** Lowie, Robert H., *The Crow Indians,* New York, Farrar & Rinehart, 1935, page 6. *See,* also, *Crow Tribal Report,* American Indian Policy Review Commission, Crow Tribal Council, 1976.

The present controversy is striking in its parallel to the antiquitous reasons for removing an unpopular camp chief.

**34.** Crow Tribal Report, *id.* at 76. It is unfortunate that the availability of the Federal Judiciary seems ostensibly to have deprived these once proud people of such honorable and admirable qualities.

**35.** Id.

**36.** Crow Tribal Report, id.

and the young, the preliterate and the highly educated, the conservative full-blooded Crow leaders and the liberal and mixed breeds, once they were confronted with a common antagonist, worked in apparent harmony and unity until about 1910."[37]

After about five years of common experience on the political front, the educated young Crow leaders considered themselves better able to handle the affairs of the tribe, as well as the destiny of the tribe, than the tired, old, uneducated chiefs. The chiefs, on the other hand, regarded the young men as undependable and too easily aroused to anger in the heat of an argument with Senators and Congressmen. Many of the young men were considered undependable by the old chiefs because they could be bought by the opposition. Thus, distrust and disunity developed openly on both sides. The council people of both factions paused long enough in their power struggles to consider reorganizing and streamlining the council structure to meet the ever-increasing tribal emergencies. On September 26, 1910, the first business committee was organized, consisting of three elected representatives from each of the six districts on the reservation.

The power struggles continued within the council and with new committees, the tribal members establishing committees and abolishing them and taking over by other maneuvers. The only common ground enjoyed by the council was its opposition to off-the-reservation interests attempting to take over the Crow lands.

With the establishment of the Crow Act of June 4, 1920,[38] a new era in Crow Tribal Council politics took place. The new Crow Act, which was designed for the general administration of the Crow Reservation affairs, did not require any particular system of tribal government. Accordingly, the council system continued with the usual power struggles and the usual resultant turmoil. In 1921, the general council attempted to establish a new business committee with two representatives to be elected from each of the now-recognized seven districts. By December of 1921, the committee members were elected, but only one had been elected from each district. Amid protest and opposition on the ground that only the educated had been elected, the Indian Office approved the committee and the set of by-laws that it had adopted in May of 1922. This committee evolved into a general council.

The general council system of tribal government inherited the factionalism of committee days. Various persons and groups attempted to gain control of the council by electing or otherwise getting their man in as chairman or secretary, the only elective positions in the council. However, the general council was kept alive by such matters as the Soap Creek oil boom of the early 1920's, the lease problems, the drought and depression years of the 1930's, and the war years of the 1940's. From the year 1920 to the year 1948, about 160 council meetings were held. Unlike the present, in the old days average attendance at council meetings was about 80 out of nearly 1,000 eligible voting members of the Tribe. In the course of the first thirty years of history of the general council system, only seven different persons acted as chairman of the general council, only eight different persons functioned as secretaries.

The Indian Reorganization Act of 1934 gave the Crow Tribe the option of becoming organized and incorporated. After a period of discussion, the tribal leaders rejected the so-called Government Act. The Crows said that they already had the Crow Act of 1920 which gave them a sufficient measure of self-government. Until 1948, the general council operated like an open town hall structure. No constitution and by-laws, plan of operation, or other procedures were established to govern the actions and activities of the council. In addition, no organizational requirements, such as membership and attendance, were formulated. In fact, the general council was so loosely organized that it was easily subjected to the manipu-

37. Id. at 80.

38. 41 Stat. 751, Chapter 224 (June 4, 1920).

lations and control of a few strong politicians and their crafty floor managers.[39] These few were for the most part the same bright young men with whom the old chiefs had first cooperated and then fought against in the land-grabbers fight in the early 1900's.

After World War II, many young Crows returned to the reservation. They were better educated than their ancestors and seemed to be eager to improve reservation life.[40] It did not take long for the young Crows who had returned to the reservation to realize that their greatest enemies were not the reservation superintendent and other Bureau of Indian Affairs officials, but the Crow politicians. Thus, in 1947, Chairman Harry Pretty On Top appointed a committee of 17 persons to draw up a constitution and by-laws. The committee, with the assistance of the Bureau of Indian Affairs and tribal lawyers obtained and examined several constitutions from other tribes that had been organized under the Indian Reorganization Act. In the spring of 1948, the task was completed and ready for consideration. In the meantime, two of the remaining few old-line politicians took opposite views with respect to the newly proposed government.

One of the old-line politicians endorsed the new proposed form of government, undoubtedly thinking that he eventually could control it.[41] The other quickly wrote his own constitution and by-laws, also thinking that he could maintain his political status quo. After bitter floor fights during two council meetings, the new constitution was discarded. A one-man constitution was adopted on June 24, 1948, and was approved, in turn, by the Indian Office in Washington, D. C., on May 23, 1949. The new constitution, the one-man constitution, did not change the old council system at all but merely legitimized the old system on paper. Since the adoption of the constitution, tribal affairs have been governed by the provisions of the 1948 document as amended.

It is against this background that the Court must consider the plaintiff's challenge to his removal as the chairman of the Crow Tribal Council. It is appropriate to note the similarities and parallels between the underlying facts of Stands Over Bull's impeachment and the history of Crow tribal politics. Once again, there are factions. Once again, the Crow Tribe is faced with a demand for its natural resources. And once again, it appears that the greatest enemy the Crow has is the politics of the Tribe that lead to disunity, factionalism, and inability to meaningfully strive toward the concept of self-government on the Crow Reservation.

## V. DISCUSSION.

There are two basic propositions against which the plaintiff's civil rights claims must be measured. The first is that so long as the Crow Tribe does not violate the Indian Civil Rights Act, the Crows may structure their government in any manner they please. *Howlett v. The Salish and Kootenai Tribes of the Flathead Reservation,* 529 F.2d 233, 240 (9th Cir. 1976). Secondly, and most significantly, the Indian Civil Rights Act contains no requirement that the tribes have a republican form of government. *Jacobson v. Forest County Potawatomi,* 389 F.Supp. 994, 995 (E.D.Wis. 1974). Thus, the plaintiff's due process claims are not to be gauged against the United States Constitution and the procedure set forth therein for impeachment, but they are to be measured against tribal custom and structure of government so long as that structure does not itself deny the plaintiff, in its implementation, the due process of law.

The Ninth Circuit has held: "Although due regard for the historical, governmental, and cultural values of the Indian tribes has resulted in some variance in the protections accorded under the Bill of Rights and the Indian Civil

---

**39.** Crow Tribal Report, *supra,* at 85, n. 31.

**40.** Id. at 86.

**41.** Crow Tribal Report, *id.* at 86.

Rights Act, see *Tom v. Sutton,* 533 F.2d 1101, 1104–1105 n. 5 (9th Cir. 1976), and cases cited therein, our court has written that the due process clauses of both documents have the same meaning." *Red Fox v. Red Fox,* 564 F.2d 361 (9th Cir., 1977).

This does not mean, however, that every procedural right and nicety declared to exist under the due process clauses of the Fifth and Fourteenth Amendments necessarily attach to this proceeding. Rather, the individual right to fair treatment under the law must be weighed against the clearness of the particular guarantee afforded the individual, taken together with the magnitude of the tribal interest as applied to the particular facts. *Martinez v. Santa Clara Pueblo,* 540 F.2d 1039 (10th Cir. 1976), cert. granted 431 U.S. 913, 97 S.Ct. 2172, 53 L.Ed.2d 223 (1977).

### A. Tribal Power to Remove.

█ The tribal defendants contend that Article V of the Crow Constitution allows the Crow Tribal Council to remove an officer for cause. The plaintiff contends that the Crow Tribal Chairman may only be removed as a result of some misconduct or negligence or non-diligence in connection with the protection of the rights of the Crow Tribe in its relations with the Bureau of Indian Affairs or local employees.[42] It is unnecessary to reach a determination on the issue of whether or not, absent malfeasance or misfeasance in connection with the Bureau of Indian Affairs, the Crow Tribe could remove its chairman for cause. The record reflects that the plaintiff, Pat Stands Over Bull, interfered with and failed to protect the Tribe's relations with the Bureau of Indian Affairs in connection with several of the articles of impeachment.[43]

**42.** The interpretation that the plaintiff seeks to place on Article V of the Crow Tribal Constitution would significantly inhibit the self-governing powers of the Tribe. However, there is some support for the plaintiff's position when it is considered with respect to the testimony of Eloise Pease concerning the history of the impeachment provision of the Constitution. Knows The Gun Minutes, page 27 [Document

### B. Plaintiff's Due Process Claims.

The gravamen of the plaintiff's complaint is that he was not afforded basic fairness in either the tribal forum or the tribal procedure that resulted in his removal from office. However, what the plaintiff claims he was entitled to by virtue of the due process language of the Indian Civil Rights Act far exceeds the standard of fundamental fairness which is applicable in this case.

The case which is most analogous to the present case was decided by the District Court in Minnesota. *Indian Political Action Committee v. Tribal Executive Committee of the Minnesota Chippewa Tribe,* 416 F.Supp. 655 (D.Minn.1976). The White Ghost Band of the Minnesota Chippewas had traditionally employed a "town hall" type of procedure in order to resolve intratribal disputes. At the town hall meeting, which was public, each member of the Tribe who had an interest in a particular issue was given an opportunity to speak. Likewise, the Crow Tribe, as was pointed out above, since its earliest days, has employed a town hall type of government which is known as the Tribal Council. All Crow tribal business is conducted in this fashion. The instructive language of the *Indian Political Action* case is set forth below:

> "In the present litigation, plaintiffs' claims concerning the hearing procedures cannot be measured by normal due process standards including formal testimony, cross-examination, a written record, and written reasons for decision. The 'town meeting' type hearing which was employed by the TEC is the traditional form of tribal hearing and must be measured by the general standard of fundamental fairness." *Indian Political Action Committee, supra* at 659.

The *Indian Action Committee* Court went on to say that

No. 9, Court Record]. Because the evidence adduced supports a finding under the literal language of Article V, it is unnecessary, as was previously stated, to decide the meaning of Article V.

**43.** See Court Record and Articles of Impeachment 3, 4, 6, 10 and 12.

"All of the protests in all of the elections in issue were heard by the TEC at an open meeting. All who cared to present evidence or argument were allowed to do so. No formal subpoenas or invitations to testify were issued, but all tribe members had notice of the meeting and were given the opportunity to speak. The General Election Board was required to present evidence regarding the charges stated in the protests and to answer any questions propounded by the audience. In the protest hearing regarding the second election, the plaintiff protesters were represented by their attorney. . . This court refuses to hold that this time-honored and customary procedure employed by the TEC is so lacking in fundamental fairness as to constitute a denial of due process. All members of the tribe had notice of the meeting, and all who came were given the opportunity to be heard. No fairer procedure could exist." *Indian Political Action Committee, supra* at 659.

■ Likewise in this case, the forum in which the impeachment resolution was considered followed a procedure in acting that is time-honored by the Crow Nation. The fact that the plaintiff did not avail himself of his opportunity to present his side of the case at the proper forum is not tantamount to a denial of due process of law. *Cf. Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The plaintiff's refusal to present his case to the tribal council, and his election to disregard the proceedings as being those of a kangaroo court, are a manifestation of a vague familiarity with some precepts of Anglo-American jurisprudence and a disregard for the culture and tradition of the Crow Tribe. In this case, although there were no formal invitations and even though non-tribal members were not permitted to speak,[44] notice was properly given of the quarterly meeting and the agenda for that meeting.

■ Under the Indian Civil Rights Act, Pat Stands Over Bull was entitled to the even-handed application of tribal customs, traditions and any formalized rules relative to the impeachment proceeding itself. *Cf. Crowe v. Eastern Band of Cherokee Indians, Inc.,* 506 F.2d 1231, 1237 (4th Cir. 1974). The proceeding was not of a criminal nature and therefore the incidents of the Sixth Amendment are inapposite. *See, Indian Political Action Committee v. Tribal Executive Committee, supra* at 659. The interest sought to be protected here is in the nature of a "Liberty" interest, that is, the plaintiff's good name, reputation, honor, or integrity is at stake because of what the Tribe has done to him. *Cf. Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). As such, the minimal requirements of the due process clause had to have been met: notice of the allegations against him and the opportunity to be heard. It is in this sense that the Ninth Circuit has pronounced that the due process clause of the Indian Civil Rights Act and the Bill of Rights have the same meaning. *Red Fox v. Red Fox, supra* at 361. The plaintiff had no right to a hearing before an impartial tribunal. The proceeding was not a criminal proceeding. His right was to a fair hearing before the tribal council. That he received. There is simply nothing in the record to show the tribe is in a state of chaos and confusion since plaintiff's removal.

■ Due process in the context of the Indian civil rights cases applied to the facts of this case does not mean that the plaintiff had to be removed by a process that parallels the impeachment process set forth in the United States Constitution.[45] *Howlett v. Salish and Kootenai, supra* at 238. This Court refuses to hold that the manner in which Patrick Stands Over Bull was removed from office is so lacking in

---

**44.** There are exceptions, in that Larry Yonkee, the plaintiff's attorney, was permitted to speak before the impeachment resolutions were considered, and the tribal attorney acted as parliamentarian for the council.

**45.** *See, Jacobson v. Forest County Potawatomi,* 389 F.Supp. 994, 995 (E.D.Wis.1974); Charles L. Black, *Impeachment, a Handbook* (Yale University Press, 1974).

fundamental fairness as to constitute a denial of due process.

## CONCLUSION.

I find that it was within the power of the Crow Tribal Council to remove Patrick Stands Over Bull from office. The procedure which was followed in removing Stands Over Bull from his position as tribal chairman was not so lacking in fundamental fairness that the Court can find the due process clause of the Indian Civil Rights Act was violated. Indeed, Stands Over Bull's removal reflects an image which is mirrored in the history of the Crow Tribe. The question here, as in all cases where there is a claim of denial of due process, is not "what is due process?", it is, rather, "what process is due?" [46] The plaintiff was given notice of the proceedings against him and afforded the opportunity to rebut those charges. The Tribe acted with due regard for the fundamental fairness owed to the plaintiff in light of the historical and cultural values of the Crow Indians. As such, I find that the defendant Crow Tribe of Indians' motions for summary judgment should be granted. Therefore,

IT IS ORDERED that the defendant Crow Tribe of Indians' motions to dismiss with respect to the constitutional claims set forth in Counts VII, IX, X, XII and XV of the complaint be, and the same hereby are, granted.

IT IS FURTHER ORDERED that the motion of the federal defendants to dismiss for want of subject matter jurisdiction be, and the same hereby is, granted.

IT IS FURTHER ORDERED that the defendant Crow Tribe of Indians' motion for a judgment on the pleadings be, and the same hereby is, denied.

IT IS FURTHER ORDERED that the plaintiff's motion to strike the affidavit of Bud Fritzler and the exhibits attached thereto be, and the same hereby is, denied.

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment pursuant to Rule 56, F.R.Civ.P., be, and the same hereby is, denied.

IT IS FURTHER ORDERED that the defendant Crow Tribe of Indians' motion to dismiss, treated as a motion for summary judgment, be, and the same hereby is, granted.

IT IS FURTHER ORDERED that judgment be entered for defendants and against the plaintiff, and that the plaintiff be denied all relief.

The Clerk is directed to enter, by separate document, a judgment consistent with this order and to notify the parties of the entry of this order.

---

46. *See, e. g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Morrisey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).